**Francis Awuku MALLET, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–98–481–CR.**

Court of Appeals of Texas, Fort Worth.

Jan. 6, 2000.

Joseph F. Zellmer, Denton, for Appellant.

Bruce Isaacks, Crim. Dist. Atty., Pamela J. Moore, Paige McCormick, Rick Daniel, Asst. Dist. Attys., Denton, Matthew Paul, State's Pros. Atty., Austin, for Appellee.

PANEL F: DAUPHINOT and RICHARDS, JJ.; and WILLIAM BRIGHAM, J. (Retired, Sitting by Assignment).

## OPINION

LEE ANN DAUPHINOT, Justice.

Francis Awuku Mallet appeals his conviction for aggravated sexual assault of a child. A jury found Appellant guilty of the offense and assessed punishment at fifteen years' confinement. In six points, Appellant complains (1) the evidence is legally and factually insufficient to support the verdict, (2) he received ineffective assistance of counsel, and (3) the trial court erred by not conducting a hearing on his motion for new trial and by denying his motion for new trial. We affirm.

### FACTUAL BACKGROUND

At trial in October 1998, K.A. testified she was twelve years old in October 1996. Appellant is married to K. A.'s cousin, Lutricia Mallet, and K.A. had known Appellant since 1993 or 1994. K.A. was given permission to spend the weekend of October 18, 1996, with Lutricia and Appellant. There were soccer games and a soccer party scheduled for Saturday. On Friday night, Lutricia and Appellant picked her up and they stopped at Black–Eyed Pea for takeout. Later, at their apartment, K.A. fell asleep on the sofa while watching television. She was dressed in a jacket

and jogging pants. While she was sleeping, Lutricia went to the grocery store.

K.A. awoke as Appellant was pulling down her pants and underwear. Appellant took her legs and put them on his shoulders and "stuck his penis" in her "butt." K.A. was crying and telling Appellant to stop because it hurt. After five or ten minutes, Appellant stopped and she pulled her pants up and sat on the sofa. Appellant put his shoes on and pulled his nightgown back down. The nightgown was long and had red and green letters that said "Ho, Ho, Ho." Appellant told her that "voodoo made him do it." Although she did not know what an anus is, K.A. testified her "butt" is her backside, where she "goes to the bathroom." She stated that Appellant "stuck his penis in [her] butt." She acknowledged that Appellant's penis came in contact with her "butt" and "went inside [her] butt." She was not sure whether Appellant's penis was hard at the time. Appellant left the apartment, and K.A. went to look for Lutricia. She did not know Lutricia had gone to the grocery and wondered why Lutricia had not stopped Appellant. She picked up a cordless phone from the kitchen counter, but could not get a dial tone. She waited. After Appellant and Lutricia returned to the apartment, Lutricia asked her why she was crying. K.A. told her that her stomach hurt and Lutricia gave her something for it. The grocery bags were from Kroger's and had blue lettering. When Lutricia went in to shower, Appellant told her to put her hand on a Bible and swear not to tell anybody about what happened.

That night, she slept with Lutricia and Appellant slept on the sofa. She called her mother before going to sleep. She wanted to tell her mother to come get her, but she was too afraid. The next day, Lutricia, Appellant, and K.A. went to several soccer games. After the games, they stopped at an arts and crafts fair. They also stopped at Sam's Club and CiCi's before going back to the apartment. Appellant gave K.A. an ankle bracelet and told her he would give her a jogging suit. Later that night, K.A. called her father and asked to spend the night with him. On Sunday, K.A. returned to her mother's house. K.A. told her godsister about what Appellant had done and agreed to tell her mother. Her mother called K. A.'s father and they met with the police. Afterwards, they took her to the hospital for an examination.

Ronnie Antoine, K. A.'s father, testified that on Saturday night, October 19, 1996, he received a phone call from K. A., and that K.A. wanted him to come get her at Appellant's and Lutricia's. Arrangements were made, and he met Appellant and Lutricia at the designated time and place. During the drive back home, K.A. talked about what Appellant "was going to do for her." The next day, he worked in the yard. K.A. was unusually quiet and inactive. At about 7:30 p.m., he took K.A. home. K.A. went directly upstairs without talking to anyone. When he returned to his house, he had a message on his answering machine from K. A.'s mother that Appellant "had molested K. A." He and K. A.'s mother met with the police and took K.A. to the hospital to be examined.

Dr. Susan Dugopolski, a pediatrician, testified that on October 20, 1996, she conducted K. A.'s sexual abuse exam. She stated that K.A. came to the emergency room for an exam "because she had told her mother that her cousin's husband had inserted his penis into her butt." Her notes taken prior to the exam, as well as notes taken by the triage nurse, substantially coincide with K. A.'s version of events. Dr. Dugopolski indicated that because K.A. used the term "butt," it was necessary to clarify that K.A. was referring to her anus. There were no physical findings of penetration, which is not unusual for anal penetration.

Ashley Cannady, K. A.'s godsister, testified she was nineteen at the time of trial. Several years earlier, at the time of the incident, she was living with K.A. and her mother. She recalled that on October 20,

1996, she was in the bathroom curling her hair when K.A. came into the room. K.A. was hysterical and very scared. K.A. told her about what Appellant had done and asked her not to tell anyone. Ashley told K.A. that she could not do that and that, if K. A didn't tell her mother, she would. K.A. agreed to do so. K.A. appeared very nervous and scared and was crying a lot. K.A. was worried about whether anybody would believe her.

Carrie Thompson, a caseworker for Child Protective Services, testified she is specially trained in areas of child maltreatment and abuse. Following a referral and investigation of alleged abuse, she makes a determination of (1) "ruled out," which means there is not enough information to cause her to believe abuse has occurred, (2) "unable to determine," which means that based on the information gathered she is unable to determine whether abuse has occurred, or (3) "reason to believe," which means based on the information gathered she has reason to believe abuse has occurred. She stated that factors considered in this determination include the child's statement, the consistency of the child's statement, the child's motive, if any, and medical evidence. She received a referral concerning K. A.'s allegations. She spoke to the detective assigned to the case, received copies of the police report and K. A.'s affidavit, and requested copies of K. A.'s medical records. On October 29,1996, she conducted an interview of K.A. Her report of the interview indicated that K.A. seemed relieved that Appellant was in jail and that her parents believed her. She did not discuss the details of the alleged assault with K. A., but focused instead on how K.A. was feeling and about abuse counseling. At the conclusion of the investigation, her "findings were reason to believe for sexual abuse." She did not interview Appellant during her investigation, although she did attempt to contact him at the Dallas County Jail and sent a findings letter to Appellant at the jail.

Dallas police detective Arleen Martinez testified she works in the Child Abuse Unit and was assigned to K. A.'s case. She interviewed K.A. and K. A.'s mother. She stated that what K.A. told her mother about the incident was consistent with what K.A. told her. Based on the information provided by K. A., Martinez obtained a warrant for Appellant's arrest. Martinez and her partner went to Appellant's address and spoke with Lutricia. They informed Lutricia that Appellant had been charged with a felony offense and left their card with her. Their efforts to locate Appellant were unsuccessful. A day or two later, Appellant surrendered himself at the police department.

Dallas police detective Monica Smith, Martinez's partner, testified that she too was assigned to investigate K. A.'s allegations against Appellant. After obtaining the warrant for Appellant's arrest, she and Martinez went to Appellant's apartment to look for him. She indicated Lutricia was not very cooperative with the detectives and would not answer any of their questions except to say that Appellant wasn't home. They were unable to locate Appellant at his home or the area soccer fields. The next evening, Appellant came to the station and was arrested. Appellant was intoxicated, so she did not question him about the offense.

Balinda Antoine, K. A.'s mother, testified she gave K.A. permission to spend the weekend of October 18, 1996, with Lutricia and Appellant. She stated that K.A. did not go to their house often and when K.A. did go, she went to see Lutricia with whom she was very close. K.A. returned home the following Sunday night and went directly upstairs. Later, K.A. and her godsister Ashley came downstairs. Ashley kept encouraging K.A. to "talk to your mom." Finally, K.A. told her, "Francis raped me." K.A. was scared and sobbing uncontrollably. After calming down, K.A. described the assault in detail. Balinda's rendition of the incident as told to her by K.A. substantially coincides with K. A.'s

testimony at trial. She called K. A.'s father and then called Lutricia's and Appellant's home. She spoke to Lutricia and instructed her to have Appellant call. When Appellant called her back, she confronted him. Appellant claimed that nothing happened and asked her not to call the police. After talking to Appellant, she called 911. She and K. A.'s father later took K.A. to meet with the police and to the hospital for an examination.

Lutricia Mallet testified on behalf of the defense. According to Lutricia, after picking up K.A. on Friday night, they stopped at Black–Eyed Pea for takeout and then went directly to Albertson's for groceries. Appellant and K.A. waited outside in the van for her because she only needed a few items. When she came out of the store, the van was parked in the same spot it had been parked in. She got into the van and they went home. Thereafter, Appellant and K.A. were never alone together in the apartment. She recalled that K.A. wasn't feeling very well and that her stomach was hurting. She also recalled K.A. calling her mother before going to sleep. The next day, after the final soccer game, they stopped at a crafts fair. It was at the crafts fair that she believed K.A. overheard Appellant and one of the exhibitors talking about "voodoo." After leaving the fair, they stopped at Sam's Club and then went home. Appellant was too tired to go to the soccer party. Later that night, K.A. wanted to go to her father's house. Arrangements were made to meet K. A.'s father, and she and Appellant dropped off K.A. at the designated place and time. She denied that Appellant had a nightgown as described by K. A., but stated that they did keep a black Bible in the house. She recalled that after Appellant's arrest, he was eventually released on bail. Sometime in 1997, Appellant went to St. Louis, Missouri, where he was arrested again in connection with this case. She admitted she never discussed her version of the events with the police. She stated that Appellant told her he "didn't do anything," and she believed him.

Appellant testified similarly. He stated that prior to the incident he was employed as a soccer coach and was coaching four recreational girls' soccer teams. On Friday night, they picked up K.A. and stopped for takeout at Black–Eyed Pea. From there, they drove directly to Albertson's. Lutricia was inside the store for approximately eight minutes, during which time he and K.A. waited in the van in front of the store. When Lutricia came out, they went home. They ate the takeout and K.A. complained of a stomach ache. After they finished eating, K.A. wanted to watch the big screen television in the living room, but Appellant told her to go sleep with Lutricia and watch the T.V. in the bedroom. He watched a soccer game and then fell asleep. On Saturday, he coached several soccer games and, after the last game, they walked through a crafts fair near the soccer field. He explained that he and a "strange" lady at the show were talking about "Louisiana voodoo," and K.A. was standing behind him during the conversation. After leaving the crafts fair, they went to Sam's Club and CiCi's before going home.

At home, Appellant told Lutricia and K.A. that he was too tired to go to the soccer party. K.A. wanted Appellant "to take her to see a guy she had a crush on," but he refused. K.A. seemed upset and went into the bedroom and started using the phone. Arrangements were made to deliver K.A. to her father. Sunday evening, Lutricia told Appellant about the telephone call from K. A.'s mother. He returned her call and asked that she not call the police and allow him to confront K.A. about the allegations face-to-face. He denied having a Christmas nightgown with the letters "Ho Ho Ho." He stated he does not drink alcohol and denied that he was intoxicated when he turned himself in at the police station. He stated K.A. lied about the events of October 18, 1996. Appellant's license to coach soccer was suspended pending resolution of the case. He

filed for unemployment, which ran out quickly. In late 1997, he arranged to go to Missouri on a temporary basis to help a friend in his business and give private soccer training. He was stopped for a traffic violation in St. Louis and arrested on the outstanding warrant in this case.

On rebuttal, the State recalled Ronnie Antoine, K. A.'s father, who testified that he had a telephone conversation with Lutricia on Monday following the incident. During the conversation, Lutricia told him that Appellant went to the grocery store that Friday night, that she stayed home with K. A., and that she only left the apartment to help get the groceries out of the car. Balinda Antoine, K. A.'s mother, was also recalled and testified concerning a conversation she had with Lutricia on Sunday night following the incident. Before telling Lutricia what K.A. had told her about the assault, she asked Lutricia if she left the apartment and went to the grocery store on Friday night. Lutricia told her she had. Also, in rebuttal, the State called an acquaintance and friend of K. A.'s mother who testified that K.A. was one of the "most respectful little girls" she knows and was very truthful and honest.

Appellant recalled Lutricia who denied telling K. A.'s father that Appellant went to the store that night during their telephone conversation.

## SUFFICIENCY OF THE EVIDENCE

In points one and two, Appellant challenges the legal and factual sufficiency of the evidence to support the verdict. Specifically, Appellant contends the evidence

was insufficient to prove his sexual organ touched or penetrated the anus of K. A.

A person commits aggravated sexual assault if he intentionally or knowingly causes the anus of a child younger than 14 years of age to contact the sexual organ of the person, or causes the penetration of the anus of a child younger than 14 years of age by any means.[1]

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict.[2] The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3] This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[4]

On the other hand, in reviewing the factual sufficiency of the evidence to support a conviction, we are to view "all the evidence without the prism of 'in the light most favorable to the prosecution.' "[5] We may only set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[6] In performing this review, we are to give "appropriate deference" to the fact finder.[7]

In his argument, Appellant asserts that K.A. was clear about only one thing in her testimony—that she was not sure whether Appellant's penis ever went inside or made contact with her anus. K.A. did not know what an anus is and referred to

---

**1.** *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (iv) (Vernon Supp.2000).

**2.** *See Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

**3.** *See McDuff v. State,* 939 S.W.2d 607, 614 (Tex.Crim.App.), *cert. denied,* 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997).

**4.** *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

**5.** *See Clewis v. State,* 922 S.W.2d 126, 129 (citing *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)).

**6.** *See id.*

**7.** *See id.* at 136.

her "butt" or "backside," which, according to Appellant, are undefined and ambiguous terms that would include the buttocks. Appellant proposes that because no drawings or anatomically correct dolls were used to demonstrate that K.A. was indeed referring to her anus, it is just as likely that she was referring to her buttocks. Appellant contends the term "anus" as used in the penal statute "is intended in the strict anatomical sense—the posterior opening of the alimentary canal—thus excluding the buttocks."

Viewed in the light most favorable to the verdict, we conclude a rational jury could have determined beyond a reasonable doubt that Appellant's penis contacted and penetrated K. A's anus. K.A. stated that she knew what a penis is and agreed that it is the male sexual organ. She explained that a "butt" is your "backside" and acknowledged that it is "where you go to the bathroom." She testified Appellant's penis came into contact with her "butt," that he "stuck his penis in [her] butt," and that his penis "went inside [her] butt." She said Appellant did this for five to ten minutes and that she cried and told him to stop because it hurt. On the basis of this testimony, the jury could reasonably infer that K. A.'s reference to "butt" or "backside where she goes to the bathroom" was a reference to her anus. Notwithstanding K. A.'s use of unsophisticated language, she sufficiently communicated to the jury that both contact and penetration occurred with respect to a part of the body within the meaning of the statute.[8] Furthermore, Dr. Dugopolski testified that she clarified with K.A. that she used the word "butt" to describe her anus, and the medical records indicate that "the anus stung a little afterwards." The evidence was legally sufficient to support the verdict. We overrule point two.

■ Likewise, we conclude the evidence was factually sufficient to support the jury's verdict. After reviewing the entire record, and keeping in mind K. A.'s lack of technical knowledge in accurately describing the prohibited part of her body, the jury's determination that Appellant intentionally contacted and penetrated K. A.'s anus with his penis is not so uncertain, inconsistent, improbable, or unbelievable that it would be clearly wrong and unjust to allow the verdict to stand. In a sexual assault case, the child victim's testimony alone is sufficient evidence to support a conviction.[9] The jury, as fact finder, chose to believe the testimony of K.A. and other State's witnesses and disbelieve the testimony of Appellant and his wife. We will not substitute our judgment for that of the fact finder in matters concerning the weight to be given contradictory testimonial evidence which necessarily requires an evaluation of credibility and demeanor.[10] We overrule point one.

### MOTION FOR NEW TRIAL/INEFFECTIVE ASSISTANCE

Appellant combines his argument in points three through six. In points three and four, he complains he was deprived of his constitutional right to effective assistance of counsel.[11] In points five and six, he contends the trial court erred by not conducting a hearing on his motion for new

---

8. *See Clark v. State*, 558 S.W.2d 887, 889 (Tex.Crim.App.1977); *Gallegos v. State*, 918 S.W.2d 50, 54 (Tex.App.—Corpus Christi 1996, pet. ref'd); *Williams v. State*, 911 S.W.2d 788, 790 (Tex.App.—San Antonio 1995, no pet.); *Pryor v. State*, 719 S.W.2d 628, 631 (Tex.App.—Dallas 1986, pet. ref'd), *cert. denied*, 485 U.S. 1036, 108 S.Ct. 1599, 99 L.Ed.2d 913 (1988).

9. *See Montoya v. State*, 841 S.W.2d 419, 422 (Tex.App.—Dallas 1992, pet. ref'd) (op. on

reh'g), *vacated on other grounds*, 906 S.W.2d 528 (Tex.Crim.App.1995); *O'Hara v. State*, 837 S.W.2d 139, 141–42 (Tex.App.—Austin 1992, pet. ref'd).

10. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex.Crim.App.1997).

11. *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art. 1, § 10.

trial and by denying his motion for new trial.

Appellant was convicted of the instant offense on October 7, 1998. Appellant filed a timely motion for new trial on October 14, 1998, which was subsequently withdrawn. On November 4, 1998, within the time allowed, he filed an amended motion for new trial generally alleging that he was denied effective assistance of counsel.[12] On November 12, 1998, he filed five supporting affidavits, and presented the amended motion and affidavits to the trial court.[13] The trial court initially scheduled a hearing on the motion; however, at the State's request, the trial court reconsidered and denied the request for a hearing. The motion was subsequently overruled by operation of law.

■ Initially, we address the State's contention that neither the trial court nor this court should consider the supporting affidavits because they were untimely. Specifically, the State asserts that because the affidavits were filed after the time had lapsed to amend his amended motion for new trial, the trial court was precluded from considering the affidavits in determining the merits of the issues raised in Appellant's amended motion for new trial, as is this court.[14] We agree.

■ Although it is not statutorily required that a motion for new trial be supported by affidavits, it is well settled that when the grounds for a new trial are outside the record, the movant must support his motion by his own affidavit or by the affidavit of someone with knowledge of the facts.[15] Appellant's amended motion for new trial was timely filed; however, it was not supported by affidavits. In an attempt to supplement his amended motion, Appellant filed his own affidavit, the affidavits of potential witnesses Diane Nabholtz, Michael Carter, Kim Dudley, and the affidavit of Appellant's counsel on appeal, Joseph Zellmer.

The affidavits of "soccer parents" Nabholtz, Carter, and Dudley reflect the affiants were potential character witnesses and could have testified concerning K. A.'s demeanor at a soccer game the next morning, Appellant's good character and his hard work and dedication to the soccer team, and that despite the allegations they would trust Appellant to be alone with their daughters. Appellant's affidavit and the affidavit of his appellate counsel allege or suggest various acts or omissions by trial counsel.

The affidavits, however, were filed after the thirty-day period allowed to amend a motion for new trial had expired. Appellant proposes that the time restraints for filing an amended motion for new trial do not apply to supporting affidavits, and that because his amended motion for new trial was timely, the affidavits filed after the thirty-day period, but within the ten-day period allowed for presentment of the motion to the trial court, were properly filed and before the court.[16] We do not believe the law supports his position.[17] Accordingly, we conclude the affidavits were not timely filed and appellant's attempt to supplement his amended motion for new trial with the supporting affidavits was, in effect, an untimely attempt to amend the motion. Consequently, the trial court could not properly consider the affidavits in support of Appellant's amended motion for new trial, nor may we. We therefore review Appellant's remaining points without the benefit of the affidavits.

12. *See* Tex.R.App. P. 21.4(b).

13. *See* Tex.R.App. P. 21.6.

14. *See* Tex.R.App. P. 21.4(b).

15. *See Reyes v.* State, 849 S.W.2d 812, 816 (Tex.Crim.App.1993); *Bearden v. State,* 648 S.W.2d 688, 690 (Tex.Crim.App.1983).

16. *See* Tex.R.App. P. 21.4(b), 21.6.

17. *See Dugard v. State,* 688 S.W.2d 524, 529 (Tex.Crim.App.1985), *overruled on other grounds by Williams v. State,* 780 S.W.2d 802, 803 (Tex.Crim.App.1989).

### Ineffective Assistance of Counsel

In points three and four, appellant complains that he received ineffective assistance of counsel due to various omissions of his trial counsel. Specifically, Appellant complains that counsel failed to interview and call potentially beneficial witnesses, adequately prepare for trial, and communicate with Appellant concerning the case.

To prevail on an ineffective assistance claim, Appellant must first show that his counsel's performance was deficient; second, he must show the deficient performance prejudiced the defense.[18] The first component is met by showing Appellant's trial counsel made errors so significant he was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution.[19] When a convicted defendant contends his trial counsel was ineffective, the defendant must show the attorney's representation fell below an objective standard of reasonableness.[20] The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.[21] "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[22] Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight.[23]

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable.[24] A defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[25]

An attorney is ineffective if the failure to seek out and interview potential witnesses precludes the accused from advancing a viable defense.[26] Although we cannot ascertain from the record why trial counsel did not locate, interview, or call other potential witnesses to testify at trial, it does not appear that his failure to do so precluded Appellant from advancing his defense that he did not commit the offense. Moreover, the record is devoid of any evidence, that we may consider, that Appellant supplied the names of any potential witnesses to counsel prior to trial and that they would have been willing and available to testify on Appellant's behalf at trial.[27] The record does reveal that counsel requested a recess in the proceedings during trial to allow him additional time for the purpose of contacting potential witnesses, and that he in fact attempted to contact potential witnesses, but was unable to do so. Appellant has not demonstrated that counsel was ineffective on this basis.

As to Appellant's complaint that trial counsel failed to adequately prepare for trial, he contends, among other things, that counsel demonstrated a "general unpreparedness" by making "virtually no ob-

18. See *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex.Crim.App.1999).

19. See *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

20. See *id.* at 687–88, 104 S.Ct. at 2064.

21. *Id.* at 688–89, 104 S.Ct. at 2065.

22. See *id.* at 690, 104 S.Ct. at 2066.

23. See *id.* at 689, 104 S.Ct. at 2065.

24. See *id.* at 687, 104 S.Ct. at 2064.

25. See *id.* at 694, 104 S.Ct. at 2068.

26. See *Rodd v. State*, 886 S.W.2d 381, 384 (Tex.App.—Houston [1 st Dist.] 1994, pet. ref'd).

27. See *Wilkerson v. State*, 726 S.W.2d 542, 550 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Simms v. State*, 848 S.W.2d 754, 758 (Tex.App.—Houston [1 st Dist.] 1993, pet ref'd).

jections during trial." However, Appellant does not offer any objections that counsel should have made.[28] To satisfy the first prong of *Strickland,* Appellant must identify the specific objection which should have been made and provide authority in support of his argument that the objection would have been meritorious.[29]

◼ Appellant also directs us to the fact that it was necessary for counsel to handwrite a motion for continuance and Appellant's application for probation, the latter of which he asserts was legally inadequate under article 42.12, section 4(e) of the code of criminal procedure.[30] Appellant, however, fails to explain why the necessity of handwriting a pleading or document to be filed with the trial court constitutes deficient performance. And, even assuming counsel was ineffective by filing a defective application for probation, Appellant failed to show he was prejudiced by the defective pleading or that the outcome would have been different had the pleading complied with statutory requirements. Nothing in the record or the notes from the jury suggest that the jury considered placing Appellant on probation after returning a verdict of guilty.

◼ Appellant next points us to the lack of notes and legal research in trial counsel's file. Although it is impossible to determine from the record whether counsel did in fact make notes or conduct research, we do not find Appellant's argument persuasive. An examination of the totality of counsel's representation reveals that counsel filed several pretrial motions, obtained discovery, conducted voir dire, objected at least five times during testimony of State's witnesses, cross-examined all of the State's witnesses, called two witnesses, and, in closing argument, advanced Appellant's defense that he did not commit the crime. Additionally, during the punishment phase, counsel gave an opening statement, called two witnesses, and gave a closing statement urging the jury to consider probation. Contrary to Appellant's contention, counsel's performance reflects a thorough familiarity with the facts and circumstances of the case and Appellant's defensive theory. Appellant has not demonstrated that counsel was ineffective on this basis.

◼ Finally, Appellant complains counsel failed to communicate with him concerning the case and counsel's trial strategy or to prepare him to testify. Appellant offers no evidence to support this claim, other than his own affidavit and the affidavit of his appellate counsel, which we have already decided are not to be considered by this court. Accordingly, the evidence, as it exists, is insufficient to show trial counsel failed to communicate with Appellant.[31] Appellant has not demonstrated counsel was ineffective on this basis.

Because Appellant has failed to meet his burden to rebut the presumption that trial counsel rendered adequate assistance by showing that counsel's performance fell below an objective standard of reasonableness, and that his defense was prejudiced as a result, we overrule points three and four.

### Motion For New Trial

◼ In point five, Appellant complains the trial court erred by denying him a hearing on his amended motion for new trial. A defendant's right to an evidentiary hearing on a motion for new trial is not an absolute right, and we will reverse a trial court's decision not to conduct a hearing only where the court has clearly

---

**28.** *See Simms,* 848 S.W.2d at 758.

**29.** *See Ryan v. State,* 937 S.W.2d 93, 98 (Tex. App.—Beaumont 1996, pet. ref'd).

**30.** TEX.CODE CRIM. PROC. ANN. art. 42.12, § 4(e) (Vernon Supp.2000).

**31.** *See Thompson v. State,* 9 S.W.3d 808, 811 (Tex.Crim.App.1999).

abused its discretion.[32] An evidentiary hearing is necessary if the motion accompanied by one or more affidavits shows reasonable grounds that would entitle Appellant to the relief requested in the motion.[33] Appellant's amended motion for new trial, in which he generally asserts that he was "denied effective assistance of counsel," without more, is insufficient to establish reasonable grounds that Appellant was entitled to relief.[34] Accordingly, the trial court did not abuse its discretion in failing to hold an evidentiary hearing on the motion. We overrule point five.

 In point six, Appellant asserts the trial court erred by denying his amended motion for new trial. Contrary to Appellant's assertion, his motion for new trial was not denied, but overruled by operation of law. A trial court's decision to deny a motion for new trial or allow it to be overruled by operation of law is also reviewed on an abuse of discretion standard.[35] Appellant's allegation that he was denied effective assistance of counsel in his amended motion for new trial was unsupported by affidavit and was not apparent from the record. It was therefore insufficient to warrant the granting of a new trial. For this reason, we conclude the trial court did not abuse its discretion in allowing the motion for new trial to be overruled by operation of law. We overrule point six.

We affirm the trial court's judgment.

---

**32.** *See Reyes,* 849 S.W.2d at 815–16.

**33.** *See Jordan v. State,* 883 S.W.2d 664, 665 (Tex.Crim.App.1994); *Reyes,* 849 S.W.2d at 816.

**34.** *See Reyes,* 849 S.W.2d at 816; *Mendoza v. State,* 935 S.W.2d 501, 503 (Tex.App.—Waco 1996, no pet.).

**35.** *See State v. Gonzalez,* 855 S.W.2d 692, 696 (Tex.Crim.App.1993); *Galvan v. State,* 988 S.W.2d 291, 297 (Tex.App.—Texarkana 1999, pet. ref'd).