In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-99-00169-CV


______________________________




CHRISTOPHER LEIGH JOHN, Appellant



V.



MARSHALL HEALTH SERVICES, INC., AND


HARRISON COUNTY HOSPITAL ASSOCIATION, INC.,

D/B/A MARSHALL REGIONAL MEDICAL CENTER, Appellees



 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 97-1132




 



Before Morriss, Grant, and Cornelius,* JJ.

Opinion by Justice Cornelius

Justice Ross not participating




______________

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment

O P I N I O N



 Dr. Christopher Leigh John sued Marshall Health Services, Inc., and Harrison County
Hospital Association, d/b/a Marshall Regional Health Center (collectively the hospital) for damages,
alleging that the hospital fraudulently induced him to enter into a physician's recruitment contract
to move his medical practice from Brownwood, Texas, to Marshall, Texas. The case went to trial
before a jury. After the close of the evidence, the trial court submitted the case to the jury. After
considerable deliberations, the jury announced that it was hopelessly deadlocked. At that point, the
trial court stated it was going to declare a mistrial, but then it directed a verdict against Dr. John. 
Dr. John now appeals. Because we find that Dr. John presented some evidence supporting his claim
of fraudulent inducement, we reverse and remand the case for trial. 

 Dr. John is a physician specializing in internal medicine. Before moving his practice to
Marshall, he practiced medicine in Brownwood. In Brownwood, Dr. John began to buy or lease
various pieces of specialized equipment, including an electrocardiogram machine, a heart monitor,
a pulmonary function laboratory, a cardiopulmonary exercise laboratory, a bone densitometry
instrument, and an echocardiogram. Because of this expensive equipment, Dr. John needed a large
number of patients needing the use of that type of testing equipment in order to have a successful
practice. His practice fared well in Brownwood, but eventually he became worried about the number
of physicians coming to the Brownwood area, so he expressed his concern to a physicians' recruiter. 
The recruiter passed Dr. John's resume along to the Marshall hospital's recruiter, Diana Taylor. 
Taylor then began to recruit Dr. John to move to Marshall. During the recruitment process, Taylor
and Dr. John had between ten and twenty telephone conversations. Dr. John also met jointly with
Taylor and Robert Driewer, the hospital's CEO. Dr. John testified that he had three major concerns
related to relocating his practice: whether there was a sufficient number of potential patients in the
area to sustain a busy medical practice, whether he would be able to use his specialized skills and
equipment, and whether there would be call coverage available to him. Taylor sent Dr. John a packet
of information about Marshall and the hospital. Included in the packet was a profile of the hospital
which contained, among other things, the following information:

 Marshall Memorial Hospital is the only hospital in the county and has a service
population of 25,000 in Marshall and has a total of 75,000 for the county. The
primary service area of Marshall evidenced a draw rate of 85.2% per 1,000
population. The majority of the Hospital's total admissions (75%) come from
Marshall.


Later, in the process of conducting discovery for his lawsuit, Dr. John learned that the hospital had
commissioned a "Community Health Care Assessment" study. This study was released to the
hospital approximately eight months before the recruitment of Dr. John, and among other things, it
revealed that "[o]nly 27.4% of the people surveyed [within the hospital service area] said they would
seek medical help in Marshall as opposed to neighboring towns." The hospital had also completed
a telephone survey approximately five months before the recruitment of Dr. John. This survey
concluded that only seventeen percent of the service population received health care in Marshall. 
None of the information in these surveys was revealed to Dr. John in the recruiting process.

 Dr. John testified that, during his recruitment, Taylor repeatedly assured him Marshall was
desperate for medical care and that his skills and equipment would be needed in the area, and that
call coverage would not be a problem. Taylor testified she did not remember the substance of the
conversations between her and Dr. John. After these discussions with Taylor and a visit to Marshall,
Dr. John and the hospital entered into a Physician Recruitment Agreement. This contract contains
a disclaimer which reads:

 This Agreement, any amendments or addenda hereto, and any exhibits specifically
mentioned therein constitute the entire agreement between the parties regarding the
subject matter hereof and supersede all prior contemporaneous discussions,
representations, correspondence and agreements, or whether oral or written,
pertaining thereto. This Agreement may be amended or modified only by a writing
duly executed by both parties. The language of this Agreement shall be construed as
a whole according to tis [sic] fair and common meaning and shall not be construed
for or against either of the parties hereto.

 As a result of the contract, Dr. John moved his Brownwood practice to Marshall. He testified
that his Marshall practice was not as profitable as his Brownwood practice. He saw fewer patients
in Marshall than in Brownwood, and his equipment was not used nearly as much as he had believed
it would be used. Dr. John testified that call coverage for his practice in Marshall was a "disaster
from the very beginning."

 Dr. John contends the trial court erred in entering a directed verdict for at least one of three
reasons: (1) the directed verdict was based on the trial court's erroneous reliance on the case of
Schlumberger Technology Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997); (2) the directed verdict
was not proper because there was some evidence raising a fact issue on Dr. John's claims of
fraudulent inducement; and (3) the directed verdict was erroneously entered in absence of a motion
at the close of evidence and after the jury had been discharged and a mistrial declared. 

 The trial court based its decision, at least in part, on the holding of the Schlumberger case. 
 After the jury had deadlocked and the trial court announced its intention to declare a mistrial, the
court said, "My inclination in this case based on the evidence is that with regard to Marshall Health
Services that construing Schlumberger and the Starlight [case] (1) that I should grant a directed verdict
in favor of Marshall Health Services and I will grant judgment based on that for them." In
Schlumberger, the Texas Supreme Court held that a release that clearly expresses the parties' intent
to waive fraudulent inducement claims, or one that explicitly disclaims reliance on representations
about specific matters then in dispute, can preclude a claim of fraudulent inducement. Schlumberger
Tech. Corp. v. Swanson, 959 S.W.2d at 181. However, in that case, the court emphasized that a
disclaimer of reliance or a merger clause will not always bar a fraudulent inducement claim. Id. The
court was careful to point out that its holding was specifically based on the facts "on this record." 
Id. Because the holding in Schlumberger was fact specific, it is necessary to compare the facts of
this case to those in the Schlumberger case to determine whether that case governs the situation here.

 The facts in Schlumberger revolved around a joint venture between Schlumberger and the
Swanson family to mine diamonds from the ocean floor of the South African coast. Id. at 173. The
contract involved in that case was an effort to end the relationship between the parties because they
were in a current dispute about the project's value and feasability. Id. at 174. Ultimately, the parties
agreed that Schlumberger would buy out the Swansons, and in exchange the Swansons relinquished
all rights, claims, and interests in the offshore diamond project and specifically released all causes
of action, known or unknown, against Schlumberger. Id. Later, the Swanson family alleged that
Schlumberger misrepresented the project's value to them, and they sued for fraudulent inducement
with respect to the release they had signed. Id. In Schlumberger, the court found the following facts
to be significant: (1) the parties were attempting to end their relationship, (2) the parties had become
"embroiled in a dispute," (3) they were dealing at arm's length, (4) both parties were represented by
highly competent and able legal counsel during the negotiations for the terms of the release itself,
(5) both parties were knowledgeable and sophisticated business players, and (6) the terms of the
release "in clear language . . . unequivocally disclaimed reliance" on the specific representations of
the value of the project that were the basis for the Swansons' lawsuit. Id. at 179-80. 

 After the Schlumberger decision, a number of Texas courts addressed fraudulent inducement
claims and concluded that such claims survive merger clauses and disclaimers of representation
unless those disclaimers are of the character as those in the Schlumberger case. See Woodlands Land
Dev. Co. v. Jenkins, 48 S.W.3d 415 (Tex. App.-Beaumont 2001, no pet.); Burleson State Bank v.
Plunkett, 27 S.W.3d 605 (Tex. App.-Waco 2000, pet. denied); Fletcher v. Edwards, 26 S.W.3d 66
(Tex. App.-Waco 2000, pet. denied). The contract and the circumstances surrounding its formation
determine whether a disclaimer of reliance is binding. Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d at 179. Like other post-Schlumberger cases, the circumstances surrounding the formation
of the contract in this case are quite different from the circumstances surrounding the formation of
the contract in Schlumberger. 

 Here, the contract was the beginning, not the end, of the relationship between Dr. John and
the hospital. The parties were not disputing the information provided to Dr. John. In fact, Dr. John
was relying on the information given by the hospital about the percentage of the local population that
was serviced by the hospital and the availability of call coverage, because he did not have access to
such information. Moreover, the disclaimer in this contract is not specific to the representations
made to Dr. John. The disclaimer is more like "boilerplate" contract language rather than something
negotiated by the parties. Additionally, the record does not indicate that Dr. John was represented
by legal counsel during the contract negotiations. Considering the factual distinctions between this
case and the Schlumberger case, we conclude that the trial court erred in directing a verdict against
Dr. John based on the disclaimer clause found in the physician's recruitment contract.

 We also conclude that the trial court erroneously directed a verdict because Dr. John
presented some evidence in support of the elements of his claim for fraudulent inducement.

 We review a trial court's directed verdict de novo. Knorpp v. Hale, 981 S.W.2d 469, 471
(Tex. App.-Texarkana 1998, no pet.); Graham v. Atl. Richfield Co., 848 S.W.2d 747, 750 (Tex.
App.-Corpus Christi 1993, writ denied). When reviewing a directed verdict, we consider the
evidence in the light most favorable to the party against whom the verdict was directed, disregarding
all contrary evidence and inferences, and giving the losing party the benefit of all reasonable
inferences raised by the evidence. Qantel Bus. Sys., Inc. v. Custom Controls Co., 761 S.W.2d 302,
303 (Tex. 1988). If there is any evidence of probative force to raise a fact issue on a material
question, the issue must go to the jury, and a directed verdict is improper. Najera v. Great Atl. &
Pac. Tea Co., 146 Tex. 367, 207 S.W.2d 365, 367 (1948); Cavazos v. Fidelity & Cas. Co. of N.Y.,
590 S.W.2d 173, 175 (Tex. App.-Corpus Christi 1979, no writ).

 To establish fraudulent misrepresentation, a party must establish "a material
misrepresentation, which was false, and which was either known to be false when made or was
asserted without knowledge of its truth, which was intended to be acted upon, and which caused
injury." Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47
(Tex. 1998). In this case, Dr. John offered testimony about his conversations with Taylor during his
recruitment process. He testified he was given positive assurance about each of his concerns. He
also testified that he received and relied on the hospital profile that was sent to him by the hospital. 
He testified that all of this was material to his decision to relocate his practice to Marshall, and he
relied on it in deciding to enter into the recruitment contract. Dr. John testified that, after relocating
to Marshall, he discovered that the assurances by Taylor were false. His net income was
significantly reduced. He saw fewer patients. He did not use his equipment as expected. And, he
found the available call coverage was disastrous. Viewed in the light most favorable to Dr. John,
there is some evidence, which if believed by the jury, is sufficient to establish a claim for fraudulent
inducement. These kinds of issues belong to the jury, and a directed verdict was improper in this
case. 

 The hospital contends there is considerable evidence contradicting Dr. John's evidence and
casting doubt on his reliance on any representation by Taylor or the hospital in deciding to move his
practice to Marshall. But in reviewing the propriety of the directed verdict, we are required to
disregard all contradicting evidence and consider only the evidence and inferences supporting
Dr. John's contentions. Qantel Bus. Sys., Inc. v. Custom Controls Co., 761 S.W.2d at 303.

 Dr. John also contends that a directed verdict was improper for two procedural reasons: 
(1) the motion for directed verdict was not renewed at the close of all of the evidence, and (2) the
directed verdict was granted after the trial court orally declared a mistrial. As we have found that
a directed verdict was improper because fact issues existed, it is unnecessary that we consider these
issues.



 For the reasons stated, we reverse the judgment and remand this cause to the trial court for
trial. 




 William J. Cornelius*

 Justice


*Chief Justice, Retired, Sitting by Assignment



Date Submitted: October 15, 2002

Date Decided: November 8, 2002


Publish

1. This is an unpublished opinion by the Austin Court of Appeals. The actual opinion given
to the trial court was a previously issued opinion, Starlight v. Xarin Austin I, Ltd.,
No. 03-97-00747-CV, 1998 Tex. App. LEXIS 6041 (Tex. App.-Austin Sept. 24, 1998), which was
later withdrawn. The unpublished substituted opinion is found at Starlight v. Xarin Austin I, Ltd.,
No. 03-97-00747-CV, 1999 Tex. App. LEXIS 159 (Tex. App.-Austin Jan. 14, 1999).


rm are those
that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect
a defensive theory.'" Id. In making an egregious harm determination, we evaluate (1) the entire jury
charge, (2) the state of the evidence, including the contested issues and weight of probative evidence,
(3) the arguments of counsel, and (4) any other relevant information revealed by the record as a
whole. Id. (citing Almanza, 686 S.W.2d at 171); Ellison v. State, 86 S.W.3d 226, 228 (Tex. Crim.
App. 2002); Mathonican, 194 S.W.3d at 66. 

 In this case, we find that the indictments, state of the evidence and statements of counsel
compounded the jury charge error. First, because no specific date or even month of the occurrences
in the hot tub and the attic were given in the indictment, the jury could not rule out the State's
reliance on either occurrence using timing. The state of the contested evidence revealed that, if the
jury believed Peavy's and K.R.'s testimony, clear testimony existed for two specific instances where
Alberts caused his sexual organ to contact K.R.'s sexual organ. During opening statements, the State
said:

[K.R.] is going to tell you on three separate occasions, the defendant took her panties
off or pulled her panties down and tried to have intercourse with her. One time she
was in the attic helping him move boxes. He pulled his pants down. He pulled her
pants down. Tried to have intercourse with her . . . . On another occasion, they were
in the hot tub of the defendant . . . the two of them stay in it and he tried to have sex
with her a third time.


Throughout the trial, the State failed to specify on which incident it was relying for conviction, and
counsel for both parties generally referred to all incidents of alleged touching during closing
argument. The State also said during closing: "[y]ou can see from the pictures that [K.R.] drew, she
put a penis and -- she put a vagina and a penis together . . . . Paragraph 5 is Count 2, the defendant's
sexual organ contacted the female sexual organ of [K.R.], which I just showed you." Peavy's
testimony did not specify whether the drawing was made during [K.R.'s] discussion of the touching
that occurred in the attic or in the hot tub. The State also argued, "[Y]ou don't think -- she would
make up a story that he sexually abused her and he's actually penetrated her multiple times?" 

 Given the "emphasis [o]n the State's presentation of the case, the risk of a non-unanimous
verdict was substantial." See Stuhler v. State, 218 S.W.3d 706, 718-19 (Tex. Crim. App. 2007) (jury
charge failed to require unanimous "verdict whether the appellant caused serious mental deficiency,
impairment, or injury"; egregious harm found where "[a]lthough the evidence was sufficient to
establish serious mental injury, by far the greater bulk of the State's evidence . . . was devoted to
trying to establish serious bodily injury"). There was no written or oral instruction informing the jury
that it was required to unanimously determine either that the attic incident or the hot tub incident
occurred. The potential for lack of unanimity was heightened by the repeated references in the
record to multiple penile-vaginal contacts. As was the deciding factor in Ngo, we "cannot determine
that the jury was, in fact, unanimous in finding appellant guilty of one specific . . . offense," based
on the entire record. 175 S.W.3d at 752. Thus, we find that the charge error, which allowed a
nonunanimous verdict, egregiously harmed Alberts' "right to a fair and impartial trial." (8) Id.; Stuhler,
218 S.W.3d at 719-20. We sustain Alberts' point of error, reverse the trial court's judgment on
Count II involving K.R., and remand to the trial court for a new trial.

 Due to our disposition of this case, we need not discuss the remaining points of error, with
the exception of ineffective assistance of counsel. In our opinion of the companion case, cause
number 06-09-00059-CR involving Alberts' convictions of indecency with D.G., we analyze
Alberts' complaints and determine counsel was not ineffective. That analysis is equally applicable
here.

 Since we conclude the evidence was insufficient for the jury to find Alberts committed
aggravated sexual assault as alleged under count I of cause number 21447, but find the evidence was
sufficient to convict him under the submitted lesser-included offense charge, we modify the trial
court's judgment under Count I to reflect conviction for indecency with a child by contact. As
modified, Alberts' conviction under Count I is affirmed, the punishment is reversed, and the case
is remanded to the trial court for a determination of the punishment for that offense. Also, because
the jury charge egregiously harmed Alberts in his right to a unanimous verdict under Count II of the
indictment involving K.R., we reverse Alberts' conviction under Count II and remand that portion
of the case to the trial court for a new trial under Count II.




 Josh R. Morriss, III

 Chief Justice


Date Submitted: November 6, 2009

Date Decided: December 11, 2009


Do Not Publish
1. In this case, the jury found Alberts guilty of two counts of aggravated sexual assault of K.R.
and assessed punishment of twenty-five years' imprisonment for each count. 
2. In one consolidated trial, the State tried Alberts for aggravated assault of K.R. and indecency
with D.G. See our opinion in cause number 06-09-00059-CR for disposition of Alberts' points of
error involving D.G.
3. Emphasizing the difference between the terms "anus" and "buttocks," the trial court's charge
instructed the jury to find Alberts guilty of aggravated sexual assault if they found he caused "the
anus of K.R." to contact Alberts' sexual organ beyond a reasonable doubt, and instructed them to
find Alberts guilty of indecency with a child if they found Alberts caused his sexual organ to "touch
the buttocks" of K.R. 
4. In rebuttal, the State points us to the easily distinguishable case of Mallet v. State, 9 S.W.3d
856 (Tex. App.--Fort Worth 2000, no pet.). The court in Mallet found the evidence to be sufficient
because the victim testified that the defendant "stuck his penis in [her butt]" and that his penis "went
inside [her] butt." Id. at 864. The victim also clarified the "butt" was "where you go to the
bathroom," that defendant "did this for five to ten minutes and that she cried and told him to stop
because it hurt." Id. Medical records also indicated the doctor clarified with the victim that "the
anus stung a little afterwards." Id. 
5. Malik controls "even in the absence of alleged jury charge error." Gollihar v. State, 46
S.W.3d 243, 255 (Tex. Crim. App. 2001). 
6. The jury could infer, from Alberts' conduct and the surrounding circumstances, that he had
a specific intent to arouse or gratify his sexual desire. See McKenzie, 617 S.W.2d at 216; Couchman,
3 S.W.3d at 163.
7. Specifically, the charge read: 


 Now, if you find from the evidence beyond a reasonable doubt that [appellant] on or
about the 13th day of December, 2002, did then and there unlawfully, intentionally
or knowingly steal a credit card owned by the cardholder, Hong Truong, with intent
to deprive the cardholder of the property and without the effective consent of the
cardholder; or 

 

 If you find from the evidence beyond a reasonable doubt that [appellant] on or about
the 13th day of December, 2002, did then and there unlawfully and knowingly
receive with intent to use a credit card owned by card holder, Hong Truong, knowing
the credit card had been stolen; or 

 

 If you find from the evidence beyond a reasonable doubt that [appellant] on or about
the 13th day of December, 2002, with intent to obtain a benefit fraudulently, did use
or present to [H]anh Nguyen a credit card knowing the use was without the effective
consent of the cardholder, Hong Truong, namely without consent of any kind, and
knowing that the credit card had not been issued to the defendant, then you will find
[appellant] guilty as charged in the indictment.


Ngo, 175 S.W.3d at 741 n.5 (emphasis added). 
8. See Ngo, 175 S.W.3d at 751, n.51 (citing Horton v. United States, 541 A.2d 604, 610-11
(D.C. Ct. App. 1988) (defendant's right to unanimous jury verdict violated when different factual
scenarios could have supported jury verdict on assault conviction and appellate court could not "infer
from the verdicts themselves that all the jurors were in agreement as to appellant's specific criminal
acts"); Hawaii v. Mahoe, 972 P.2d 287, 294 (Haw. 1998) (right to unanimous jury verdict violated
when defendant made two distinct entries into residence, prosecution did not elect which entry on
which to rely for conviction, and jury not given specific instruction of requirement of unanimity for
underlying criminal act); Illinois v. Scott, 612 N.E.2d 7, 9, (Ill. Ct. App. 1993) (right to unanimous
verdict violated when defendant charged with three counts of delivery of a controlled substance and
verdict form included only one count of delivery, allowing jurors to find guilt without agreeing on
which count he was guilty)).