COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-05-265-CR

 

 

JIMMY EDWARD PARKER                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.      Introduction

A jury convicted Appellant
Jimmy Edward Parker of three counts of aggravated sexual assault and assessed
his punishment at life imprisonment for count one and ninety-nine years and a
$10,000 fine for each of counts two and three. 
The trial court entered judgment accordingly and ordered that the
punishment assessed for counts two and three commence upon the completion of
the sentence assessed for count one.  In
five points, Appellant appeals his conviction. 
We affirm.

 








II.       Sufficiency of the Evidence

In his first point, Appellant contends that the evidence is
legally and factually insufficient to sustain his conviction.  

A.      Standard of Review

In reviewing the legal sufficiency of the evidence to
support a conviction, we view all the evidence in the light most favorable to
the verdict in order to determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d 691, 693
(Tex. Crim. App. 2005). 








In reviewing the factual sufficiency of the evidence to
support a conviction, we are to view all the evidence in a neutral light,
favoring neither party.  See Zuniga v.
State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual
sufficiency review is whether, considering the evidence in a neutral light, the
fact finder was rationally justified in finding guilt beyond a reasonable
doubt.  Id. at 484.  There are two ways evidence may be factually
insufficient:  (1) when the evidence
supporting the verdict or judgment, considered by itself, is too weak to
support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment and,
weighing all of the evidence, the contrary evidence is so strong that guilt
cannot be proven beyond a reasonable doubt. 
Id. at 484-85.  AThis standard
acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id.
at 485.  In other words, evidence
supporting a guilty finding can outweigh the contrary proof but still be
insufficient to prove the elements of an offense beyond a reasonable
doubt.  Id.  In performing a factual sufficiency review,
we are to give deference to the fact finder=s determinations,
including determinations involving the credibility and demeanor of
witnesses.  Id. at 481; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga,
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination
of all the evidence.  Id. at 484,
486-87.  An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on
appeal.  Sims v. State, 99 S.W.3d
600, 603 (Tex. Crim. App. 2003).

B.      Summary of the
Evidence

When B.E., the complainant in this case, was very young,
her parents divorced, and B.E.=s mother later
married Appellant.  Thereafter, B.E.
lived with her mother, Appellant, and Appellant=s son, J.P.  The family started out living in The Colony,
Texas, before moving to Princeton, Texas, when B.E. was five years old.  The family then moved to Frisco, Texas, where
B.E. finished kindergarten.  And finally,
in May 1997, they moved into a house in Little Elm, Texas, which is located in
Denton County.  








B.E., who was fourteen years old at the time of trial,
testified that she first recalled Appellant Amessing with [her]@ when they were
living in Princeton.  When asked what she
meant by Amessing with [her],@ B.E. replied, A[H]e was taking my
clothes off, and he was making me -- he was just making me give oral sex to
him.@  B.E. testified further that Appellant
continued Amessing with [her]@ after they moved
into the house in Little Elm. 

Both B.E. and her mother testified that B.E. was aged six
to nine years old when she lived in the house in Little Elm.  B.E. testified that during those years, when
her mother was at work, Appellant would occasionally pick her up from school or
day care and leave J.P. to be picked up later.[1]  B.E. testified that on these occasions, when
she and Appellant would arrive home, he would tell her to come with him to his
bedroom, and, once inside, he would lock the door. B.E. stated that Appellant
would then take off his clothes, and he would either take off her clothes or
she would take them off herself.  B.E.
testified that Appellant would then lie down on the bed, have her lie on top of
him in the opposite direction, and have her touch his penis with her hand or
mouth.  She testified that while in this
position, Appellant would also touch her hips and her vagina with his mouth and
hands.  B.E. stated that this happened
too many times to count.  

Additionally, B.E. testified that Appellant twice had her Asit on his penis,@ such that his
penis was touching her Abutt.@  She stated that it hurt and she
screamed.  B.E. stated that although
there were times when J.P. would be home during these incidents, Appellant
would Astick the back of
a chair under the doorknob, or he=d tell him he
would be grounded if he came out of the room.@  








Finally, both B.E. and her mother testified that Appellant
kept vibrators in the nightstand beside the bed.  B.E. stated that sometimes Appellant would
put one of the vibrators Aon [her] vagina,@ and once, A[h]e made [her]
stick it up his butt.@ 
Moreover, B.E. testified that there was a television in the bedroom and
that on more than one occasion, Appellant showed her Apeople having sex.@  B.E. stated that she once recognized
Appellant and her mother as the people having sex on the television.  B.E.=s mother later
confirmed that Appellant kept ten or more X-rated movies in the drawer by the
television in the bedroom and that an adult movie was made of her and
Appellant. 

In May 2000, when B.E. was nine years old, Appellant and
B.E.=s mother divorced,
and B.E. and her mother moved to a different house in Little Elm.  B.E.=s mother testified
that B.E. sat on the floor and cried when she surprised her and showed her the
new house.  That same day, B.E. tried to
tell her mother what Appellant had been doing to her by writing her mother a
letter in which she stated that Appellant had come in and dropped his towel in
front of her.  However, B.E.=s mother thought
that the incident was just an accident. 

When B.E. was in the sixth grade, she again tried to tell
someone what had gone on between her and Appellant at the house in Little
Elm.  B.E. testified that she began to
cry when a group of her friends were talking about losing their virginity.  She stated that her friend, A.M., noticed
that she was upset and asked her what was wrong.  B.E. testified that she told A.M. that
Appellant had raped her.[3] 








Although B.E. was still scared of Appellant, she and A.M.
decided to go to the school counselor. 
The counselor testified that B.E. was hesitant to talk, so she asked
B.E. if she would rather write down what her concern was.  B.E. wrote the counselor a note that stated, AHe would rape me,
and he said if I didn=t he would do something to me, or if I
didn=t do it he would
ground me.@ The counselor testified that she asked
B.E. to whom she was referring, and B.E. replied that she was referring to
Appellant.  B.E. then told the counselor
that she thought Appellant began sexually assaulting her around the age of six
or seven and continued until she was age nine. 
B.E. also told her that she had once told her mother about an incident
when Appellant had opened his towel to her but that her mother did not believe
her.   

The counselor testified that she ultimately referred the
matter to Child Protective Services on November 1, 2002.  B.E.=s mother testified
that she was notified by the Little Elm Police Department in November 2002,
after which she took B.E. to the Children=s Advocacy Center
in Lewisville. 








Peggy Hill, an employee of Child Protective Services who
was working at the Children=s Advocacy Center,
testified that on November 18, 2002, she conducted a forensic interview with
B.E.  Ms. Hill testified that B.E. told
her that Appellant Ahad put his mouth on her private part
numerous times.  She also talked about
[Appellant] having her put her mouth on his private part and a situation where
he had also put his private part in her bottom.@  Further, B.E. told her that the incidents
began when she was around seven or eight years old and continued until she was
around eight or nine; that the incidents would occur when Appellant would pick
her up early from school or day care while her mom was at work or away; that on
one occasion Appellant had locked J.P. in his room to keep him from seeing them
or getting in the way; that Appellant had shown her videotapes of people
wearing no clothes and that, once, she saw a tape involving her mother and
Appellant; that  she told her mother
about an incident in which Appellant Aopened his towel and
showed her his private part,@ but that her
mother did not believe her; and, finally, that even though she thought she
would get in trouble, she talked to the counselor about Appellant. 

The State also called Amy Cozad, Appellant=s ex-girlfriend,
to testify at trial.  Ms. Cozad stated
that she met Appellant in 2000 or 2001 and had a child with him on September
18, 2002.  When their daughter was
approximately three months old, Appellant told Ms. Cozad about the criminal
investigation relating to B.E. and B.E.=s mother.  Ms. Cozad testified that they subsequently
began moving around quite a bit.  At some
point, she became aware that Appellant possessed several pornographic
movies.  She stated that he kept them in
a red duffel bag; that he eventually burned them; and that he said that he was
burning the movies because he did not want law enforcement to find them and
think he was a pervert.  Moreover, Ms.
Cozad testified that on one occasion, she overheard Appellant and his father
talking about B.E. and her mother, and they said that it would be easier just
to hire a hit man to kill them and take care of the problem.  Ms. Cozad later reported the conversation to
the FBI and to the state sheriff=s department.   








Officer Joe Taylor, an officer in Tennessee, testified that
he received a Teletype warrant for Appellant sent from Denton County, Texas, on
October 29, 2004.  Officer Taylor
confirmed the address of Appellant=s residence and
arrived there with other officers at approximately 4:00 p.m.  Officer Taylor knocked on the front door, and
one of Appellant=s friends answered.  Although Officer Taylor saw Appellant=s truck in the
driveway and knew that Appellant had just talked to his son on the telephone,
the friend repeatedly insisted that Appellant was not there.  One of the other officers then called Officer
Taylor on his two-way phone and advised him that he had just captured Appellant
attempting to flee out of the back door of the residence.  

Appellant testified on his own behalf at trial and denied
having any kind of sexual activity with B.E. 
He further stated that he had never picked up B.E. from school or day
care without also picking up his son; that he had never locked his son in his
room; that he had never worn a towel in front of B.E. or exposed himself to
her; that a movie had been made of him and B.E.=s mother having
sex, but that he did not show it, or any other pornographic movie, to B.E.;
that he had burned the pornographic movies because he was no longer interested
in them; and that he had never talked about killing B.E. or her mother.  Appellant testified that he ultimately found
out about the allegations against him around December 2002.  Subsequently, he moved to Arkansas, and later,
he took his daughter and went to Tennessee, where he remained until his arrest
on October 29, 2004. 

C.      Discussion








Appellant was indicted on one count of aggravated sexual
assault by intentionally or knowingly causing the anus of the victim, a child
younger than fourteen years old who was not Appellant=s spouse, to
contact Appellant=s sexual organ, see Tex. Penal Code Ann. '
22.021(a)(1)(B)(iv), (2)(B) (Vernon Supp. 2006); one count of aggravated sexual
assault by intentionally or knowingly causing the mouth of the victim, a child
younger than fourteen years old who was not Appellant=s spouse, to
contact Appellant=s sexual organ, see id. '
22.021(a)(1)(B)(v), (2)(B); and one count of aggravated sexual assault by
intentionally or knowingly causing the sexual organ of the victim, a child
younger than fourteen years old who was not Appellant=s spouse, to
contact Appellant=s mouth, see id. ' 22.021(a)(1)(B)(iii),
(2)(B).  The offenses were alleged
to have occurred in Denton County on or about June 1, 1998, September 1, 1998,
and June 1, 1999, respectively.[4]  

Viewed in the light most favorable to the verdict, the
evidence shows that B.E. was ages six to nine years old when she lived in the
house in Little Elm, which was located in Denton County; that on many occasions
during those years, Appellant would lie down on his bed and make B.E. lie on top
of him in the opposite direction; that while in this position, Appellant would
make B.E. touch his penis with her hand or mouth while Appellant would touch
her hips and genitals with his hands and mouth; and that Appellant twice had
her Asit on his penis,@ such that his
penis was touching her Abutt,@ or, as she
explained to Ms. Hill, Appellant put his Aprivate part@ in her Abottom.@[5]   








Appellant
argues that the evidence is insufficient because A[t]he testimony adduced at trial was
inconsistent as to the circumstances surrounding the allegations and specifically
essential elements of the allegations against the Appellant.@  In
particular, Appellant refers to testimony from several witnesses, which
provides varying age ranges for when B.E. was assaulted.  However, when performing a legal sufficiency
review, we must resolve any inconsistencies in the evidence in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406
(Tex. Crim. App. 2000).  The trier
of fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  We may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact
finder.  Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  We therefore hold that the
evidence was legally sufficient to support the verdict.           








Likewise,
considering the evidence in a neutral light, we hold that the evidence was
factually sufficient.  As previously
stated, in performing a factual sufficiency review, we are to give deference to
the fact finder=s determinations, including determinations
involving the credibility and demeanor of witnesses.  Zuniga, 144 S.W.3d at 481; Cain,
958 S.W.2d at 407.  We may not substitute
our judgment for the fact finder=s.  Zuniga, 144 S.W.3d
at 482.  Mindful of the proper standard,
based on our review of all the evidence in a neutral light, we cannot say that
the evidence supporting the verdicts, considered alone, is too weak to support
the finding of guilt beyond a reasonable doubt, nor can we say that the
evidence contradicting the verdict of guilt is so strong that guilt cannot be
proven beyond a reasonable doubt.  Id.
at 484-85.  We therefore overrule
Appellant=s first point.

III.      Extraneous
Bad Acts Evidence

In his
second point, Appellant contends that the trial court erred in allowing
evidence of several extraneous offenses whose probative value was outweighed by
the danger of prejudice to him. 
Specifically, Appellant points to the following extraneous offense
evidence that he claims was improperly admitted at trial:  (1) evidence that Appellant and his family
members instructed a material witness not to come to court[6]; (2) evidence that Appellant destroyed
his pornographic movies so that law enforcement would not find them; (3)
evidence that Appellant attempted to evade law enforcement by moving throughout
several states after he learned that he was under criminal investigation; and
(4) evidence that Appellant and his father considered hiring a hit man to kill
B.E. and her mother. 








To preserve a complaint for our review, a party must have
presented to the trial court a timely request, objection, or motion that states
the specific grounds for the desired ruling if they are not apparent from the
context of the request, objection, or motion. 
Tex. R. App. P. 33.1(a)(1);
Mosley v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999). 
Further, the trial court must have ruled on the request, objection, or
motion, either expressly or implicitly, or the complaining party must have
objected to the trial court=s refusal to
rule.  Tex.
R. App. P. 33.1(a)(2); Mendez v. State, 138 S.W.3d 334, 341 (Tex.
Crim. App. 2004).  With the exception of
the evidence that Appellant and his father considered hiring a hit man to kill
B.E. and her mother, Appellant did not object at trial to the extraneous
offense evidence of which he now complains. 
We hold that Appellant has forfeited his complaints as to evidence that
Appellant and his family members instructed a material witness not to come to
court, evidence that Appellant destroyed his pornographic movies so that law
enforcement would not find them, and evidence that Appellant attempted to evade
law enforcement by moving throughout several states after he learned that he
was under criminal investigation.

We now turn to the evidence that Appellant and his father
considered hiring a hit man to kill B.E. and her mother.  Texas Rule of Evidence 403 provides, AAlthough relevant,
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice . . . .@ Tex. R. Evid. 403.  The trial court=s ruling on
admissibility of evidence under rule 403 is reviewed by an abuse of discretion
standard.  Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).  Therefore, as long as the trial court=s ruling was at
least within the zone of reasonable disagreement, the appellate court will not
intercede.  Id.

Rule 403 favors admissibility of relevant evidence, and the
presumption is that relevant evidence will be more probative than
prejudicial.  See id. at 389.  Santellan v.
State restated the factors discussed in Montgomery
that should go into the balancing test as follows:








(1)
how compellingly the extraneous offense evidence serves to make a fact of
consequence more or less probable--a factor which is related to the strength of
the evidence presented by the proponent to show the defendant in fact committed
the extraneous offense;     

 

(2)
the potential the other offense evidence has to impress the jury Ain
some irrational but nevertheless indelible way@;

 

(3)
the time the proponent will need to develop the evidence, during which the jury
will be distracted from consideration of the indicted offense; 

 

(4)
the force of the proponent=s need for this evidence to
prove a fact of consequence, i.e., does the proponent have other probative
evidence available to him to help establish this fact, and is this fact related
to an issue in dispute.  

 

939
S.W.2d 155, 169 (Tex. Crim. App. 1997) (footnote omitted).

 

In the present case, the contested evidence does have
probative value.  As the State points
out, the evidence that Appellant and his father considered hiring a hit man to
kill B.E. and her mother is directly relevant to Appellant=s consciousness of
guilt.  See Torres v. State, 794
S.W.2d 596, 599 (Tex. App.CAustin 1990, no
pet.) (holding evidence that appellant possessed a gun and made threats to kill
the victim=s family was admissible to show an effort
on his part to suppress and destroy evidence against him and to explain why the
victim did not make an immediate outcry). 
The only question is whether the probative value of this evidence is
substantially outweighed by the danger of unfair prejudice.  Appellant does not suggest any specific
prejudicial effect arising from the admission of the evidence, but only argues
broadly that the evidence offered by the State was unfairly prejudicial.  We hold that the trial court did not abuse
its discretion in admitting evidence that Appellant and his father considered
hiring a hit man to kill B.E. and her mother. 
We overrule Appellant=s second point.

 








IV.     Ineffective Assistance of Counsel

In his third point, Appellant contends that his trial
counsel rendered ineffective assistance by failing to seek notice of admission
of any extraneous acts prior to trial. 

To establish ineffective assistance of counsel, Appellant
must show by a preponderance of the evidence that his counsel=s representation
fell below the standard of prevailing professional norms and that there is a
reasonable probability that, but for counsel=s deficiency, the
result of the trial would have been different. 
Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984); Salinas v. State, 163 S.W.3d 734, 740 (Tex. Crim. App.
2005); Mallett v. State, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001); Thompson
v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

In evaluating the effectiveness of counsel under the first
prong, we look to the totality of the representation and the particular
circumstances of each case.  Thompson,
9 S.W.3d at 813.  The issue is whether
counsel's assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland, 466 U.S. at 688-89,
104 S. Ct. at 2065.  Review of counsel=s representation
is highly deferential, and the reviewing court indulges a strong presumption
that counsel=s conduct fell within a wide range of
reasonable representation.  Salinas,
163 S.W.3d at 740; Mallett, 65 S.W.3d at 63.  








The second prong of Strickland requires a showing
that counsel's errors were so serious that they deprived the defendant of a
fair trial, i.e., a trial whose result is reliable.  Strickland, 466 U.S. at 687, 104 S.
Ct. at 2064.  In other words, Appellant
must show there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been
different.  Id. at 694, 104 S. Ct.
at 2068.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  Id. 
The ultimate focus of our inquiry must be on the fundamental fairness of
the proceeding whose result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

A reviewing court will rarely be in a position on direct
appeal to fairly evaluate the merits of an ineffective assistance claim.  Thompson, 9 S.W.3d at 813-14.  AIn the majority of
cases, the record on direct appeal is undeveloped and cannot adequately reflect
the motives behind trial counsel=s actions.@  Salinas, 163 S.W.3d at 740 (quoting Mallett,
65 S.W.3d at 63).  To overcome the
presumption of reasonable professional assistance, Aany allegation of
ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.@  Salinas, 163 S.W.3d at 740 (quoting Thompson,
9 S.W.3d at 813).  








Here, the record does not reveal trial counsel=s strategy in
deciding not to file the pretrial request. 
See Thompson, 9 S.W.3d at 814; Brown v. State, 155 S.W.3d
625, 631 (Tex. App.CFort Worth 2004, pet. ref=d) (AThis court will
not >reverse a
conviction on ineffective assistance of counsel grounds when counsel=s actions or
omissions may have been based upon tactical decisions, but the record contains
no specific explanation for counsel=s decisions.=@).  Appellant filed a motion for new trial, but
no motion for new trial hearing was held to interrogate trial counsel regarding
his strategy.  Furthermore, the
failure to file pretrial motions is not categorically deemed ineffective
assistance of counsel.  Miranda v.
State, 993 S.W.2d 323, 327 (Tex. App.CAustin 1999, no
pet.).  Therefore, Appellant=s ineffective
assistance claims are better raised within the framework of a post-conviction
writ of habeas corpus under article 11.07 of the code of criminal
procedure.  Tex. Code Crim. Proc. Ann. art. 11.07 (Vernon 2005); see Rylander
v. State, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003) (A[T]he record on
direct appeal will generally >not be sufficient
to show that counsel=s representation was so deficient as to
meet the first part of the Strickland standard= as >[t]he
reasonableness of counsel=s choices often involves facts that do not
appear in the appellate record.=@); see also
Bone v. State, 77 S.W.3d 828, 837 n.30 (Tex. Crim. App. 2002) (AThis resolution in
no way affects appellant=s entitlement to re-urge this or other
appropriate constitutional complaints on a writ of habeas corpus.@).  We overrule Appellant=s third point.

V.      Scope of Questioning During Voir Dire

In his fourth point, Appellant contends that the trial
court erred in denying him the opportunity to ask offense-specific questions
during voir dire.  During voir dire, the
following exchange took place:

[Defense Counsel]: 
Let=s talk about an aggravated sexual
assault of a child.  What they=ve got to prove in three counts is
that Jimmy over here either put his sex organ in the mouth --

 

[Prosecutor]:  Your
Honor, I=m going to object to counsel
voir-diring on the facts of the case on this particular individual.

 

THE COURT:  I don=t think you can get into the
specific allegations in this case.

 

[Defense Counsel]: 
May I talk about the indictment, Judge?

 

THE COURT:  I don=t think you can get into the
specific allegations in this case, so, no, you can=t make reference to the allegations
in the indictment.  You can talk in
general terms of what the elements of sexual assault or aggravated sexual
assault are, but not the ones in this case. 

 








[Defense
Counsel]:  All right.  What they have to prove for aggravated sexual
assault, you=ve got to have a child under 14 or you=ve got to use a
weapon, some kind of force, okay?  So if
no force, we=re talking about a child under 14.  You=ve got to prove
that a person had sexual contact, which is either putting your sexual organ in somebody=s mouth, vagina,
or anus, or getting someone to put their mouth on your sexual organ or
anus.  It=s not good stuff,
is it? 

The trial court has broad discretion over
the process of selecting a jury and may impose reasonable restrictions on the
voir dire examination.  Barajas v.
State, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); Allridge v. State,
762 S.W.2d 146, 167 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1040
(1989).  Decision as to the propriety of
a particular question on voir dire examination is left to the trial judge=s discretion and
only an abuse of such discretion will call for reversal on appeal.  Allridge, 762 S.W.2d at 167.  A trial court=s discretion is
abused only when a proper question about a proper area of inquiry is
prohibited.  Barajas, 93 S.W.3d at
38.








Voir dire may not include details of a
particular offense.[7]  See White v. State, 629 S.W.2d 701,
706 (Tex. Crim. App. 1981), cert. denied, 456 U.S. 938 (1982) (holding
trial court did not err in refusing to let the appellant ask a hypothetical
question based on an accurate statement of what the State=s case would be); Aquino,
710 S.W.2d at 752 (holding trial court did not abuse its discretion by refusing
to allow the accused to ask a prospective juror a question based on facts
particular to his case).  Moreover,
immediately after the trial court made its ruling, Appellant was allowed to
apprise the prospective jurors in general terms of the elements of the offense
as alleged in the indictment.  Therefore,
we hold that the trial court did not abuse its discretion in denying Appellant
the opportunity to ask questions involving the specific allegations in this
case.  We overrule Appellant=s fourth
point.     

VI.     Brady Violation

In his fifth point, Appellant contends
that the trial court erred in denying his motion for mistrial because the
prosecution failed to provide the defense with exculpatory material prior to
trial pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194
(1963).  Specifically, Appellant argues
that the prosecution was required to disclose that B.E. had been hospitalized
in an inpatient psychiatric hospital. 








To find reversible error under Brady,
a defendant must show that:  (1) the
State failed to disclose evidence, regardless of the prosecution=s good or bad
faith; (2) the withheld evidence is favorable to the defendant; and (3) the
evidence is material, that is, there is a reasonable probability that had the
evidence been disclosed, the outcome of the trial would have been
different.  Hampton v. State, 86
S.W.3d 603, 612 (Tex. Crim. App. 2002). 
Favorable evidence is any evidence that, if disclosed and used
effectively, may make a difference between conviction and acquittal and
includes both exculpatory and impeachment evidence.  Harm v. State, 183 S.W.3d 403, 408
(Tex. Crim. App. 2006).  Exculpatory
evidence may justify, excuse, or clear the defendant from fault, while
impeachment evidence is that which disputes or contradicts other evidence.  Id. 
Materiality is determined by examining the alleged error in the
context of the entire record and overall strength of the State=s case.  Id. at 409.

Appellant argues that A[t]he fact that
[B.E.] underwent psychiatric treatment is a determinant of her ability to
distinguish fact from fantasy and her credibility as a witness.@  However, as the State points out, the
evidence regarding B.E.=s psychiatric treatment appears to be
unfavorable, rather than favorable, to Appellant.  See id. at 408.  The evidence supported that B.E. had seen
counselors and had gone into the psychiatric hospital after her outcry and as a
result of the alleged offenses.[8]  Furthermore, Appellant has not shown that
there is a reasonable probability that had the evidence been disclosed, the
outcome of the trial would have been different. 
The State=s case in this instance rested in large
part on the testimony of B.E., but B.E.=s mother and Ms.
Cozad gave testimony that corroborated B.E.=s version of the
events.  See id. at 409.








After examining the entire record, we hold
that the trial court did not abuse its discretion in denying Appellant=s motion for
mistrial.  The fact that B.E. was
hospitalized in an inpatient psychiatric hospital was not favorable to
Appellant, nor was there any evidence to suggest that the result of the
proceedings against Appellant would have been different if the information had
been disclosed to Appellant prior to trial. 
We overrule Appellant=s fifth point.

VII.    Conclusion

Having overruled all of Appellant=s points, we
affirm the judgment of the trial court.  See
Tex. R. App. P. 43.2(a).

 

 

 

ANNE GARDNER

JUSTICE

 

PANEL F:    CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  August 17, 2006











[1]See Tex. R. App. P. 47.4.





[1]B.E.=s mother testified that she worked
a lot and that there were times when Appellant was the one responsible for
picking up the kids and getting them home. 





[3]A.M. testified that B.E. told her
that Appellant had raped her when she was from about ages four through
nine.  B.E. told her that Appellant would
tell her mother it was okay if she wanted to go out, and when she did, that was
when he would do it. 





[4]See Sledge v. State, 953 S.W.2d
253, 256 (Tex. Crim. App. 1997) (AIt is well settled that the >on or about= language of an indictment allows
the State to prove a date other than the one alleged in the indictment as long
as the date is anterior to the presentment of the indictment and within the
statutory limitation period.@).

 





[5]See Clark v. State, 558 S.W.2d 887, 889 (Tex. Crim.
App. 1977) (holding victim=s testimony sufficient to support indecency with a child
conviction when, despite using Aunsophisticated language@ to describe the part of the body touched, she sufficiently
communicated to the trier of fact that the touching occurred to a part of the
body within the definition of the controlling statute); Mallet v. State,
9 S.W.3d 856, 864 (Tex. App.CFort Worth 2000, no pet.) (holding child victim=s testimony sufficient to support
conviction despite lack of technical knowledge in accurately describing
prohibited part of her body).

 





[6]The day before Ms. Cozad testified,
the trial court had ordered Appellant not to have any contact with her.  Nevertheless, Ms. Cozad testified that
Appellant had contacted her by telephone the night before she testified and had
asked her to go to his aunt=s house rather than come to court and testify. 





[7]Nevertheless, Appellant argues that questions
similar to those in Abron v. State, 523 S.W.2d 405 (Tex. Crim. App.
1975), and Hernandez v. State, 508 S.W.2d 853 (Tex. Crim. App. 1974),
would have been proper because they would have been narrowly tailored to an
issue relevant to the case.  However,
Appellant acknowledges that the record is Avoid@ as to what questions trial counsel
would have asked or for what purpose. 
Without a record of the specific questions Appellant intended to ask, we
are unable to address his argument.  See
Caldwell v. State, 818 S.W.2d 790, 793-94 (Tex. Crim. App. 1991) (holding
that one preserves his complaint about being unable to ask questions during
voir dire by presenting the specific question to the trial court and obtaining
an adverse ruling), overruled on other grounds by Castillo v. State, 913
S.W.2d 529 (Tex. Crim. App. 1995); Aquino v. State, 710 S.W.2d 747, 752
(Tex. App.CHouston [14th Dist.] 1986, pet. ref=d) (holding that error was waived
since the defendant failed to make a bill of exceptions as to the questions he
wished to pose to the prospective juror). 





[8]During the punishment phase of the
trial, B.E.=s mother testified that B.E. has
had extensive counseling as a result of being sexually assaulted.  Specifically, she testified that the worst
day of her life Awas seeing my daughter locked up in
a psychiatric hospital from trying to commit suicide.@ 
On cross-examination, defense counsel revisited the issue and learned
that B.E. had been in the hospital for one week.