*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★ ★ ★ ★

**MEMORANDUM OPINION**

No. 04-09-00068-CV

**IN THE MATTER OF A.C.T.**, a Juvenile

From the 386th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-JUV-01772
Honorable Laura L. Parker, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:       Catherine Stone, Chief Justice
               Phylis J. Speedlin, Justice
               Steven C. Hilbig, Justice

Delivered and Filed: February 3, 2010

AFFIRMED

A.C.T. was adjudicated as having engaged in delinquent conduct by committing two counts

of aggravated sexual assault of a child, and was committed to the Texas Youth Commission (TYC),

with a possible transfer to the Texas Department of Criminal Justice (TDCJ), for eleven years. We

affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 10, 2008, the State filed an original petition alleging that A.C.T., a fourteen year-old

boy, had engaged in delinquent conduct by committing two counts of aggravated sexual assault on

J.K., a female child younger than fourteen years old, and seeking a determinate sentence. Count I

of the petition alleged that, on or about July 17, 2007, A.C.T. intentionally and knowingly caused the sexual organ of J.K., a child younger than fourteen, to contact the sexual organ of A.C.T. Count II alleged that, on or about July 17, 2007, A.C.T. intentionally and knowingly caused the sexual organ of J.K., a child younger than fourteen, to contact the mouth of A.C.T. The State filed a pretrial "Notice of Intent to Present Outcry Statement" naming J.K.'s mother, Jeanette, as the outcry witness. After the jury was sworn and opening statements were made, a hearing was held outside the jury's presence to determine whether Jeanette or another witness subpoenaed by the defense, Sonya Vallejo, was the first adult to whom J.K. made an outcry. The trial court ruled that Sonya was the proper outcry witness. Defense counsel objected that the State had not given the fourteen-day notice required by the outcry statute as to Sonya, arguing that the "proper predicate had not been laid" for admission of Sonya's testimony as the outcry witness.[1] A discussion was held on the record during which the defense conceded it was not claiming unfair surprise or asking for a continuance. The trial court ultimately ruled that Sonya would not be permitted to testify as the outcry witness. The court later admitted Sonya's testimony about what J.K. told her as a prior consistent statement to rebut a charge of fabrication or improper influence. At the conclusion of the trial, the jury found that A.C.T. had engaged in delinquent conduct as alleged in both counts, and found that disposition was required. The court adjudicated A.C.T. as having engaged in delinquent conduct as alleged in both counts, and entered a disposition order committing A.C.T. to TYC with a possible transfer to TDCJ for eleven (11) years. A.C.T. now appeals.

---

[1] During trial, both the State and the defense referred to the adult outcry statute, article 38.072 of the Code of Criminal Procedure, instead of the juvenile outcry statute, section 54.031 of the Family Code. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (Vernon Supp. 2009); TEX. FAM. CODE ANN. § 54.031 (Vernon Supp. 2009). The two outcry statutes are interpreted the same. *In re Z.L.B.*, 102 S.W.3d 120, 123 (Tex. 2003) (per curiam).

**ANALYSIS**

In three issues, A.C.T. challenges the trial court's judgment asserting that: (1) his attorney rendered ineffective assistance by failing to inform A.C.T. of the State's plea offer and failing to explain the plea bargain process; (2) the evidence is legally and factually insufficient to support the jury's verdict that A.C.T. engaged in delinquent conduct; and (3) the court erred in admitting hearsay testimony as a prior consistent statement.

### *Ineffective Assistance of Counsel*

In his first issue, A.C.T. asserts that his trial counsel rendered ineffective assistance by failing to communicate the State's plea offer, and by failing to explain the plea bargain process to him or his mother. To establish ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him to such a degree as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 770 n.3 (Tex. Crim. App. 1999); *Harling v. State*, 899 S.W.2d 9, 12 (Tex. App.—San Antonio 1995, pet. ref'd). To show deficient performance, the first prong of the *Strickland* standard, A.C.T. must prove that his counsel's performance fell below an objective standard of reasonableness and must rebut the presumption that counsel's decisions were based on sound trial strategy. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). To satisfy this prong, any allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* at 813. We do not look at isolated acts or omissions to determine the effectiveness of counsel; rather, we review the totality of the representation. *Id.*; *Harling*, 899 S.W.2d at 12. Absent record evidence to the contrary, we must presume that counsel's conduct fell

within the wide range of reasonable professional assistance. *Thompson*, 9 S.W.3d at 813-814. With respect to the second *Strickland* prong, that counsel's deficient performance prejudiced his defense, an appellant must show there is a "reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (also stating a "reasonable probability" is one sufficient to undermine confidence in the outcome). Failure to make the required showing of either *Strickland* prong, deficient performance or sufficient prejudice, will defeat a claim for ineffective assistance. *Thompson*, 9 S.W.3d at 813.

A.C.T. presented his claim of ineffective assistance to the trial court in a motion for new trial, and attached the affidavits of A.C.T. and his mother Rose stating they were never told of any plea offer, and the affidavit of Sandra O'Neal stating the prosecutor told her the case was not being plea bargained because "they had not heard back from the defense attorney." The trial court ordered A.C.T.'s trial counsel to submit an affidavit in response. In his affidavit, counsel stated that: (1) he spoke to the prosecutor on several occasions in an attempt to negotiate a favorable plea bargain; (2) the only plea offer made by the State was for a recommendation of a 10-year determinate sentence in exchange for a plea of true, and probation was never offered by the State; (3) he discussed the State's plea offer with A.C.T. and his mother several times and explained the State had not offered to recommend probation but he would continue negotiating; (4) he specifically remembered discussing the plea offer with A.C.T. and his mother on the Saturday before trial at his co-counsel's office where they were meeting for last minute trial preparations; (5) he informed A.C.T. and his mother of the option of pleading true before the court and asking the judge for probation, but also stated his opinion that due to the severity of the allegations the judge was unlikely to grant probation

without a recommendation from the State; and (6) he recommended that A.C.T. proceed to a jury trial, at which probation was an option as well as commitment for up to forty (40) years. No hearing was held on A.C.T.'s motion for new trial, and it was overruled by operation of law.

A trial court generally abuses its discretion by failing to hold a hearing when a motion for new trial is presented and raises matters not determinable from the record. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). However, a trial court may decide a motion for new trial based on sworn pleadings and affidavits without hearing oral testimony. *Id.* (citing *Rivera v. State*, 89 S.W.3d 55, 58-59 n.9 (Tex. Crim. App. 2002)). We review a trial court's decision on a motion for new trial, whether it denies it or allows it to be overruled by operation of law, for an abuse of discretion. *Mallet v. State*, 9 S.W.3d 856, 868 (Tex. App.—Fort Worth 2000, no pet.) (citing *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993)). We will conclude that the denial of a motion for new trial was an abuse of discretion only when no reasonable view of the record could support the denial. *Holden*, 201 S.W.3d at 763; *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). "[I]n the context of a denial of a motion for new trial, a deferential rather than de novo standard applies to our review of a trial court's determination of historical facts when that determination is based . . . solely upon affidavits regardless of whether the affidavits are controverted." *Holden*, 201 S.W.3d at 763 (quoting *Charles v. State*, 146 S.W.3d 204, 210 (Tex. Crim. App. 2004)).

In support of his ineffective assistance claim, A.C.T. relies on *Ex parte Lemke*, 13 S.W.3d 791, 796-97 (Tex. Crim. App. 2000), in which the Court held that counsel's failure to inform the petitioner of the State's plea bargain offers was ineffective assistance of counsel. *Lemke* is distinguishable from A.C.T.'s case, however, because the record in *Lemke* showed that the State

made two plea offers to petitioner's counsel, counsel never advised petitioner of the offers, and the petitioner would have accepted either offer. *Id.* at 796. Here, the record contains conflicting affidavits with A.C.T. and his mother stating they were never told of any plea offer by the State, and A.C.T.'s trial counsel stating that he discussed the State's offer of a ten-year determinate sentence with both of them "several times," and specifically recalling a discussion of the plea offer with A.C.T. and his mother on the Saturday before trial in the presence of his co-counsel. The trial court was entitled to resolve the issue on the basis of affidavits alone, and to make a credibility determination between the conflicting affidavits. *Holden*, 201 S.W.3d at 763-64. Based on this record, the court did not abuse its discretion in permitting A.C.T.'s motion for new trial to be overruled by operation of law. *Id.* Moreover, given the conflicting affidavits in the record, we conclude that A.C.T. has failed to meet his burden of proving that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812-13. We overrule A.C.T.'s first issue on appeal.

### *Sufficiency of the Evidence for Adjudication*

A.C.T. asserts the evidence is legally and factually insufficient to support the jury's finding that he sexually assaulted J.K. When a juvenile challenges the legal sufficiency of the evidence by a no evidence point, we consider all the evidence in the light most favorable to the finding to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *In re K.T.*, 107 S.W.3d 65, 71 (Tex. App.—San Antonio 2003, no pet.). The jury is permitted to make reasonable inferences from the evidence, and is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998). We resolve any inconsistencies in the testimony in favor of the jury's

verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). In reviewing a factual insufficiency point, we consider and weigh all the evidence in a neutral light and will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *In re K.T.*, 107 S.W.3d at 71; *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) (appellate court will reverse for factual insufficiency only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence).

As charged in the petition, to establish that A.C.T. engaged in delinquent conduct by committing aggravated sexual assault of a child, the State had to prove that he (1) intentionally or knowingly, (2) caused the sexual organ of the child to contact his sexual organ (Count I), and caused the sexual organ of the child to contact his mouth (Count II), and (3) the child was younger than fourteen (14) years of age. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii) (Vernon Supp. 2009). It is undisputed that the child victim, J.K., was younger than fourteen years when the abuse occurred. A.C.T. contends on appeal that the evidence was insufficient to prove beyond a reasonable doubt that the alleged sexual abuse actually happened, and that, if it did happen, he was the perpetrator. A.C.T.'s defense at trial was that he was innocent, and a family dispute over housing between his mother and J.K.'s mother caused the allegations to be fabricated, with J.K. being coached to tell the story of sexual abuse.

In its case-in-chief, the State first presented the testimony of the child victim, J.K., who was four years old at the time of the offense and six years old at the time of trial. After an initial period of hesitation, J.K. testified that on the day her mommy went to the hospital to have a baby, "Church's

son" was babysitting her and her little brother. They were at Church's son's house in his room; he was laying on the bed and J.K. was sitting on the bed. He told her to take her clothes off and both of them had their clothes "off a little bit." J.K. stated that Church's son touched her with his hand on the part she goes potty with. She testified she saw his "big thingy" which is the part he goes potty with. Church's son put his thingy in between her legs, and his thingy touched on the part she goes potty with between her legs; their skin was touching and "it hurt real bad." J.K. was on top of Church's son when his thingy touched her thingy and he was doing a movement that made her feel scared. J.K. testified this happened only once. Church's son had promised to give her Chuck E. Cheese tickets if she took her clothes off, so she did.

J.K.'s mother, Jeanette, testified that her aunt is named Rose and they call her "Church," and Church's son is A.C.T. On July 2, 2007, Jeanette went to the hospital to give birth to J.K.'s youngest brother, Jesse. At the time, Jeanette and her husband and kids were living in a small house behind a larger house on a piece of property owned by Jeanette's grandfather, Mr. Rincon. Rose and A.C.T. lived on a different street nearby. Jeanette called to ask if A.C.T. could watch J.K. and her brother while she went to the hospital; A.C.T. came over and babysat J.K. and her brother at Jeanette's house. On January 17, 2008, Jeanette learned in a phone call from her mother that J.K. had told the two young daughters of Sonya Vallejo "something of a sexual nature." Jeanette asked J.K. about it, and although she was initially scared, J.K. confirmed the story about sex. Jeanette called the police that night and J.K. told the officer a similar story of a sexual nature. J.K. was then taken to ChildSafe where she was interviewed and examined by Dr. Nancy Kellogg. Jeanette testified that J.K.'s story has been consistent since that day, even though she has been scared during the whole process. She also explained that J.K. used to call A.C.T. by his first name, but now she refers to him

as "Church's son" because J.K.'s father did not want the boy's name used in their household. Finally, Jeanette testified that Rose had become the owner of the property where their small house was located after her grandfather died. She denied any hard feelings or arguments with Rose about the house or making payments for rent or bills. Jeanette stated she told J.K. to "just tell the truth" in court, and never told J.K. to lie or make up a story about A.C.T.

Sonya Vallejo testified that her two young daughters used to play with J.K. when they stayed at their grandmother's house next door to J.K.'s house. On or about January 2, 2008, her daughters told her that J.K. had mentioned "sex" to them, and they asked Sonya "what is sex?" The next day, when Sonya arrived to pick up her daughters after work, J.K. called Sonya over to the fence and asked if Sonya was her friend and if she could tell Sonya a secret. J.K. made Sonya promise not to tell anyone because A.C.T. had told her she could not tell anyone. At that point, J.K. began demonstrating with a funnel-shaped toy, telling Sonya, "this is what A.C.T. makes me do." J.K. got on top of the upside down funnel and moved back and forth, explaining, "he makes me go like this;" she also stated, "and I kiss it." J.K. stated that her reward was Chuck E. Cheese tickets. Sonya testified that J.K. told her sometimes it happened at her house when A.C.T. would babysit or when she was in a bathroom with A.C.T. J.K. told Sonya it happened multiple times in different places. Sonya urged J.K. to tell her mother, but J.K. became upset. Sonya testified, "I believed her [J.K.] 100 percent. I mean, I don't think a four year-old would demonstrate and tell me what she was telling me." Sonya called and told her sister Monica that night, who in turn called and told Jeanette's mother, who then told Jeanette. Sonya testified that Mr. Rincon died in December 2007, and J.K. told her about this in January 2008. Sonya stated that after J.K.'s allegations against A.C.T., Rose and Jeanette began arguing about issues related to the big house and the small house on the property

owned by Rose, and there was a break-in at Jeanette's house, the water was turned off, and eviction was mentioned.

Finally, Dr. Kellogg, medical director of ChildSafe, testified that she performed the medical history interview and physical exam of J.K. Dr. Kellogg's written report contains drawings which were created by J.K. during the interview; J.K. was alone with Dr. Kellogg and a medical resident in the interview room, which is the procedure used to minimize outside influences. Dr. Kellogg would ask a question, and J.K. would draw her answer while describing in her own words what she was drawing. Dr. Kellogg testified to the oral statements J.K. made during the interview, which were noted in quotations in her report. Dr. Kellogg began by asking J.K. if something happened to her body that made her feel sad or scared or confused, and J.K. answered, "Yes. [A.C.T.] He did something bad. What big grown-ups do." When asked what happened, J.K. answered, "It happened at my house and at his house. This is my house. Mommy had a baby in her stomach and she went to the doctor with daddy. I was watching TV in the living room. A.C.T. turned off the TV and I was crying. Then we went to the bathroom." J.K. drew a picture of her house and the bathroom and continued explaining, "And he told me to take off my panties. I was lying on the floor. He went up and down with this;" she drew a picture of A.C.T. and indicated his "thingy" in his front genital area. J.K. stated, "It was touching me here," pointing to her own genitals. J.K. continued, "Then milk came out and went in my mouth. It was yucky. It tasted like cow." She also said it hurt on her own genitals and her buttocks because she was laying on the floor. A.C.T. warned her not to tell or she would not get the Chuck E. Cheese tickets. J.K. stated this happened one or two times at her house, and between one and five times at A.C.T.'s house. When asked whether the other times were the same or different than this time, J.K. replied, "Different. He also lickeded [sic] my thingy." The

physical exam of J.K. was normal, yielding one "nonspecific finding" that could have been caused by trauma, but also by irritation or inflamation from other causes. Dr. Kellogg testified that it is common to find no physical evidence of sexual abuse when there is a delay between the abuse and the outcry. She also testified that the history of the incidents given by J.K. was "more detailed [and] explicit than average" for this age child. Dr. Kellogg gave her opinion that the sexual abuse did occur based on J.K.'s level of detail and use of age-appropriate language to describe the incidents.

The defense witnesses were A.C.T.'s mother Rose, and an expert witness, Dr. Ferrara. Rose testified that A.C.T. watched the kids at Jeanette's house on the day Jesse was born. She also stated that J.K. would spend the night at her house once or twice a month, but would sleep with Rose or Rose's daughter; Rose had a policy in the household against closed doors. To Rose's knowledge, A.C.T. was never alone in his room with J.K. On the day J.K. made the allegations against A.C.T., Jeanette called Rose to come over and J.K. herself told Rose in her own words about the incidents with A.C.T. Rose was in shock and thought it must be a joke; she stated that A.C.T. is a good boy who attends a private Christian school. With regard to the existence of a family dispute over the houses, Rose testified that while her father Mr. Rincon was still alive Jeanette and her family were living in the small house without paying any rent, taxes, or insurance. Rose stated the small house was unfinished when they moved in, and Jeanette was supposed to complete the house but never did; there was only one interior door inside the house and it was the door to the bathroom. Rose bought the property with the small house and big house from her father in August 2006, before he died in December 2007. After Mr. Rincon died, but before J.K.'s allegations against A.C.T., Rose told Jeanette she had to take over payments on the utilities and bills for the small house, but she failed to pay. In addition, Rose testified that Jeanette asked to move into the big house since she now had

three children, but Rose refused because she did not trust Jeanette to take care of the big house. Rose testified that none of this had anything to do with A.C.T. Rose stated that she did not know why J.K. would have lied about A.C.T. Finally, Dr. Matt Ferrara, a forensic psychologist, testified for the defense that children in the three to five-year age range like J.K. are more likely to make a false accusation of sexual abuse, and a false outcry is most likely to occur when someone has influenced the child. Dr. Ferrara stated that an adult may suggest information to the child by the way a question is asked, and the information may then become part of the story the child comes to believe is the truth.

We hold the evidence, when viewed in the light most favorable to the jury's finding, is sufficient for a rational trier of fact to have found the elements of aggravated sexual assault as alleged in Counts I and II beyond a reasonable doubt. The jury had the ability to resolve any conflicts in the evidence and to assess the witnesses' credibility and the weight to be given their testimony. *Curry*, 30 S.W.3d at 406; *Mosley*, 983 S.W.2d at 254-55. In addition, the evidence in support of the jury's finding that A.C.T. committed aggravated sexual assault as alleged in Counts I and II is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Lancon*, 253 S.W.3d at 705; *In re K.T.*, 107 S.W.3d at 71. We overrule A.C.T.'s challenges to the sufficiency of the evidence.

### *Admission of Prior Consistent Statement*

Finally, A.C.T. argues the trial court erred in admitting Sonya Vallejo's hearsay testimony as a prior consistent statement "when no express or implied challenge was made to the complainant's testimony on the grounds of recent fabrication or improper influence or motive." As noted, *supra*, it was determined that Sonya Vallejo was the proper outcry witness; however, her testimony about

what J.K. told her was not admitted under the outcry statute, but, rather, was admitted as a "prior consistent statement" under Rule 801(e)(1)(B). TEX. R. EVID. 801(e)(1)(B) (providing that a statement is not hearsay if the declarant testifies at trial subject to cross-examination, and the statement is consistent with the declarant's testimony and "is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive"). It is clear from the record that the declarant, J.K., testified at trial and was cross-examined; further, it is not disputed that her prior statement to Sonya was consistent with her trial testimony. The only question before us is whether a charge of recent fabrication or improper influence or motive was raised which would warrant admission of J.K.'s prior consistent statement under Rule 801(e)(1)(B). We review the trial court's ruling that a prior consistent statement is admissible under Rule 801(e)(1)(B) for an abuse of discretion. *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007).

A.C.T. argues on appeal that he made no express or implied charge of recent fabrication or improper influence, stressing that his attorney's cross-examination of J.K. contained no reference to recent fabrication or improper influence that would warrant admission of J.K.'s out-of-court statement. However, the Court of Criminal Appeals clarified in *Hammons* that a charge of fabrication or improper influence "may be subtly *implied* through tone, tenor, and demeanor," and need not be restricted to the specific wording used by counsel. *Id.* at 799. Because there is no "bright line" between a challenge to the witness's memory or credibility and a suggestion of conscious fabrication, the trial court has substantial discretion in determining whether the tenor of the questioning reasonably implies a conscious intent to fabricate. *Id.* at 804-05. In determining whether the record shows an implied charge of recent fabrication or improper influence was raised, an appellate court focuses on the "purpose of the impeaching party, the surrounding circumstances,

and the interpretation put on them by the [trial] court." *Id.* at 808. In addition to the totality of the questioning, we may also consider clues from the voir dire, opening statements, and closing arguments of counsel. *Id.* The ultimate question is whether, giving deference to the trial judge's assessment of tone, tenor, and demeanor, a reasonable trial judge could have concluded that a charge of recent fabrication or improper influence was raised. *Id.* at 808-09.

Here, during opening statements, A.C.T.'s counsel raised the defensive theory of a family feud over housing arrangements on the property owned by Rose, A.C.T.'s mother, as the background leading up to J.K.'s allegations. Specifically, counsel stated,

> Because in order to understand these people, in order to understand this situation, you don't just go back to January 24th of this year [2008] when the statements were made . . . You've got to go back decades, and you need to understand the Rincon family . . . Mr. Rincon was a good man . . . when Jeanette and her husband Justin – when they [sic] getting ready to get out of the military and Air Force – didn't have a place to live, Mr. Rincon went and . . . built a house in the back of his house . . . he made sure that when she got out of the Air Force, she had a place to live. And everything between the family was good . . . But that didn't last forever.
>
> Unfortunately, in December of 2007, Mr. Rincon passed away. And things began to unravel. About a year before he passed away, he sold his house to Rose, to [A.C.T.'s] mother, – sold the house that he lived in, in back of which Jeanette['s] . . . family . . . lived. And while Mr. Rincon was alive, Jeanette never had to worry about paying rent. She didn't have to pay utilities, didn't have to pay taxes, didn't have to pay insurance. But after Mr. Rincon passed away, Rose had a conversation with Jeanette. And she let her know that things were going to be different; that she was going to have to pay all those things that she never had to pay before. And at the same time, Sandra, who's Jeanette's mother, . . . began to lean on Rose, began to put pressure on her to let . . . Jeanette . . . and [her] family move into the bigger house. And there were a couple problems with that. First of all, there was already a relative who had been living there . . . Secondly, she simply didn't trust that Jeanette . . . would take care of the house. They hadn't shown the ability to do that with the little house. And after . . . 30 or 45 days, the bills began to roll in. And Rose would get notices that nothing was being paid and she got frustrated. And she began to sit down with Jeanette and explain to her that . . . she was going to pay her end or they were going to talk about Jeanette moving to another place.

> Now, January 24th of this year, 2008, all of this comes to a head. Stories go around that [A.C.T.] has been sexually abusing [J.K.]. And, of course, after letting the police know, Jeanette goes and talks to Rose and tells her this has been going on. Well, Rose continues this – this idea . . . Jeanette's not paying anything. So she's going to go and have her evicted. And the situation gets worse and worse and unravels and unravels. And here we are today.

Counsel also told the jury they would hear evidence from the defense about "the family dynamic" and "exactly what this family situation was like" to help them understand J.K.'s allegations.

In addition, before admission of J.K.'s out-of-court statement to Sonya, defense counsel cross-examined J.K.'s mother, Jeanette, concerning any arguments or bad feelings between her and Rose about payments for the small house and whether Jeanette and her family would be moving into the big house. Specifically, counsel asked Jeanette whether she ever paid rent, taxes, or insurance on the small house while Mr. Rincon was alive, and whether Rose had told her she needed to take over payment of the bills after he passed away. Counsel also inquired whether Jeanette had conversations with her mother, Sandra, about moving into the big house after Mr. Rincon's death. Jeanette agreed that Rose had talked to her about paying the bills for the small house, but denied wanting to move into the big house and denied any hard feelings or arguments about these issues. In addition, defense counsel questioned Jeanette about whether J.K. was "a very obedient child" who "does pretty much everything you ask her to do" and "what she thinks she needs to do to make you and your husband happy." Counsel pointed out that she and her husband had told J.K. not to use A.C.T.'s real name anymore, and so J.K. stopped using it. On redirect, the State responded by asking Jeanette whether she had "ever told [J.K.] to lie" or "to create a story" about A.C.T. Jeanette answered, "No," and stated that she had only told J.K. to answer honestly and "tell what happened to her," and "tell the truth."

In ruling that Sonya Vallejo would be permitted to testify to J.K.'s out-of-court statement about the sexual abuse by A.C.T., the court noted that J.K. had already testified and been subjected to cross-examination. The court stated the prior consistent statement was being admitted "to rebut the defense that this is somehow a fabrication or a coaching situation to rebut some family feud regarding the ownership of these houses." During cross-examination of Sonya, defense counsel inquired whether she knew of any arguments between Rose and Jeanette over the housing situation. Sonya testified that Rose had argued with Jeanette about the houses, there had been a break-in, the water was turned off, and eviction was mentioned. Defense counsel continued to raise the family discord theme during his questioning of Rose during the defense case. Rose testified that before J.K.'s allegations she informed Jeanette to start paying the bills and utilities for the small house, but Jeanette did not pay them. Rose also stated that Jeanette and her mother asked Rose whether Jeanette's family could move into the big house, but Rose refused; there was one argument about this. When counsel asked Rose whether J.K. "has reasons to lie," Rose replied she did not know why J.K. would have lied. Finally, during closing arguments, counsel for A.C.T. again brought up the family discord and suggested that someone had influenced parts of J.K.'s story. Further, we note that in his brief A.C.T. concedes that his "defensive theory was, from the beginning of the trial, that the child had been coached prior (emphasis omitted) to the outcry to Sonya Vallejo . . . in retaliation for Rose []'s attempts to collect bills owed her by Jeanette . . . ."

The record shows that during questioning, as well as opening statements and closing arguments, A.C.T.'s counsel made an implied charge that J.K.'s allegations were the product of improper influence by Jeanette and her family in retaliation against A.C.T.'s mother, Rose, for the housing dispute. In admitting the evidence under Rule 801(e)(1)(B), the trial court specifically noted

the basis was to rebut charges of coaching or fabrication due to a family feud over housing. We conclude the trial court did not abuse its discretion in admitting Sonya's testimony about J.K.'s out-of-court statement under Rule 801(e)(1)(B).[2]

### *Conclusion*

Based on the foregoing reasons, we overrule A.C.T.'s issues on appeal and affirm the trial court's judgment.

Phylis J. Speedlin, Justice

---

[2] A.C.T. also argues on appeal that the prior consistent statement was not made prior to the time the motive to fabricate arose, as required by *Hammons*. *See Hammons*, 239 S.W.3d at 804. However, A.C.T.'s generalized objection to the prior consistent statement in the trial court did not inform the court of the argument he now raises on appeal; therefore, this complaint was not preserved. TEX. R. APP. P. 33.1(a); *see Medina v. State*, 7 S.W.3d 633, 639 (Tex. Crim. App. 1999) (complaint on appeal must comport with trial objection or nothing is preserved for appeal); *see also Bolden v. State*, 967 S.W.2d 895, 899 (Tex. App.—Fort Worth 1998, pet. ref'd) (to complain on appeal that prior consistent statement is inadmissible because it does not predate motive to fabricate, appellant must have objected on that basis in trial court); *Meyers v. State*, 865 S.W.2d 523, 524-25 (Tex. App.— Houston [14th Dist.] 1993, pet. ref'd) (general hearsay objection under Rule 801 did not preserve complaint on appeal that prior consistent statements contained in state's exhibit were made after motive to fabricate arose and thus exhibit was not admissible as prior consistent statement).