

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00337-CR
### NO. 02-11-00338-CR
### NO. 02-11-00339-CR
### NO. 02-11-00340-CR
### NO. 02-11-00341-CR
### NO. 02-11-00342-CR
### NO. 02-11-00343-CR

CHARLES FRANKLIN WOODRUFF                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

## FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In five issues, appellant Charles Franklin Woodruff appeals his convictions

for three counts of indecency with a child by contact, two counts of sexual

---

[1]*See* Tex. R. App. P. 47.4.

assault, one count of aggravated assault with a deadly weapon, and one count of aggravated sexual assault of a child.[2] We affirm.

## Background Facts

Rebekah Woodruff and Paul N. are the parents of C.N. (Courtney), who was born in December 1989, and B.N. (Brandy), who was born in September 1992.[3] Rebekah and appellant are the parents of W.W. (Whitney), who was born in July 2004. When Rebekah and Paul divorced, Courtney and Brandy lived with Rebekah, and they eventually also lived with appellant and Whitney. Paul married another woman, Mindy N.

Courtney, who was twenty-one years old at the time of the trial in July 2011, is autistic and is mildly mentally retarded. Rena Fore, who worked with special needs students for Graham ISD, developed a relationship with Courtney when Courtney became a freshman in high school. Fore knew that Courtney was autistic, but Fore did not believe that Courtney had trouble separating fantasy from reality. Michelle McGee also worked with special needs students in Graham, and she had known Courtney since Courtney was in elementary school. According to McGee, Courtney was a "high-functioning autistic child."

---

[2]*See* Tex. Penal Code Ann. §§ 21.11(a)(1), 22.011(a)(1)(A), (2)(B), 22.02(a)(2) (West 2011), § 22.021(a)(1)(B)(i), (2)(B) (West Supp. 2012).

[3]To protect the victims' anonymity, we will use initials and aliases to refer to some of the individuals associated with appellant's crimes. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

On April 17, 2008, when Courtney was eighteen years old and was a junior in high school, she acted poorly at school. Fore and McGee talked to Courtney about her behavior. Courtney told them that she had been sexually abused by appellant. McGee called Rebekah. Rebekah came to the school, and Courtney told her, in much more detail, what she had said to McGee and to Fore. Rebekah asked Courtney questions, and during those questions, according to Fore, Courtney pointed to "[h]er breast area and her bottom." To Fore, Rebekah appeared to be startled and disturbed. Rebekah eventually left the school, and McGee called a law enforcement hotline.

The next day, Adult Protective Services (APS) contacted Jeff Smith, an investigator with the Graham Police Department, about Courtney's outcry of sexual abuse. Officer Smith learned that Rebekah was not being cooperative with APS's investigation into the abuse and that Rebekah did not believe that Courtney's allegations were true. In fact, on April 18, 2008, Rebekah and Courtney both signed a document stating that Courtney did not want to be questioned by authorities without Rebekah's consent and without Rebekah's presence.

Between April 17 and April 22, 2008, Courtney left the house where Rebekah and appellant lived and moved in with her biological father, Paul, and her stepmother, Mindy. Shortly after Courtney moved in with Paul and Mindy, Mindy took Courtney back to Graham so that Courtney could attend a prom. On the way to Graham, Courtney talked to Mindy about appellant's putting his penis

3

in Courtney's "hole." After the prom, Mindy took Courtney to a Domino's Pizza restaurant to meet appellant because appellant had said that he wanted to take a picture of Courtney. At the store, Mindy heard appellant asking Courtney about "her body parts" and about whether she wanted to talk to the police.

Mindy brought Courtney to an interview about her allegations of sexual abuse. Upon the request of APS, Dr. Brandon Bates, a licensed clinical psychologist, performed a psychological evaluation of Courtney in June 2008. Dr. Bates explained that prior to his evaluation of Courtney, he knew, based on records that he had received from another doctor and from Courtney's school, that she was autistic,[4] that she was mildly mentally retarded, and that she had been enrolled in special education programs throughout her school years.

Based on his evaluation, Dr. Bates concluded that Courtney's "adaptive functioning age" was seven years and three months, although Courtney was actually eighteen years old at the time of the evaluation. Nonetheless, Dr. Bates opined that Courtney was able to speak in a logical and coherent manner, that she responded to questions appropriately, that she had the capacity to remember

---

[4]At trial, Dr. Bates described autism as

> stereotype behaviors such as twirling or rocking or hand clapping. That's one of the criteria. Another one is failure to make eye contact . . . . [Autistic people] have a really hard time understanding how other people may feel, can't read facial gestures, [and have a] really difficult time intermingling with other people and just relating to them on a general level. And then there has to be some delay in spoken language as well.

4

events and narrate facts, and that she was capable of knowing the difference between the truth and a lie. Dr. Bates opined that Courtney's autism and mental retardation rendered her incapable of consenting to a sexual encounter.

At trial, Courtney testified that appellant, who she called "Charlie," had touched her with his penis on her "boobs," vagina, and "butt." Specifically, she testified that appellant had put his penis in her "butt," which hurt her badly.

For years, Brandy denied, on several occasions, that appellant had sexually abused her or Courtney. But Brandy eventually told her fiancé, Dalton, about being sexually abused by appellant. Dalton committed suicide in March 2010 after he and Brandy broke up. It was Dalton's last wish for Brandy to tell someone about the abuse, so Brandy called Matt Pruitt, a deputy with the Young County Sheriff's Office.[5] Deputy Pruitt and his wife, Tracy, went to a park to meet with Brandy. Brandy told them that appellant had sexually abused her, and she revealed details about an incident that had occurred with appellant and "Mack," her boyfriend before she was engaged to Dalton.

At trial, Brandy said that she had initially denied appellant's sexual abuse of her because she was scared of appellant,[6] she thought that she was the only one being abused, and she believed that she was protecting her sisters.

_____

[5]Brandy knew Deputy Pruitt because his daughter was one of Brandy's friends.

[6]Brandy said that appellant had threatened to kill her if she told anyone about the abuse.

5

Brandy testified that over the course of several years while she lived with appellant, he had touched her vagina and her breasts with his hands, had put his penis in her vagina on more than one occasion, and had also put his penis in her mouth. Brandy also said that appellant had forced her to watch pornography with him.

Brandy and Mack each testified about a night in 2008 when they met appellant at Brandy's stepgrandmother's empty house. At the time, Brandy and Mack were fifteen years old. Appellant let them drink alcohol.[7] Appellant told them to exchange the alcohol between each other's mouths as they were kissing. Later, appellant told Mack to take off his shirt so that appellant could perform an Indian healing ritual.[8] After appellant started chanting over Mack and Mack pushed appellant off of him, appellant pulled out a gun and asked Mack if he was scared. At that time, Mack said that he was not scared (although Mack testified at trial that he was scared). Appellant rubbed the gun around Mack's head, face, and shoulder.

Later that night, appellant and Mack went outside and sat in a pickup, where appellant again pointed the gun at Mack. Appellant told Mack that he wanted Mack and Brandy to have sex while appellant watched. Mack initially

---

[7]Brandy testified that appellant started giving her vodka when she was ten years old.

[8]Mack had cancer. He testified, "[Appellant] was rubbing parts of my chest and chanting in Indian and asked me if that had helped my chest pains. . . . [T]he answer was no, and it seemed to upset him just a little bit."

resisted. But because Brandy was in the house, because Mack was scared for her well-being, and because appellant had said that he would go get her only if Mack got "hard," Mack took off his shorts and tried to arouse himself. When Mack could not do so, however, appellant "reached over and put his hand on the base of [Mack's] penis and moved his fingers around kind of in a stroking motion." Mack still could not become aroused, and appellant asked Mack whether appellant needed to "use [his] mouth," which angered Mack. Mack shoved appellant, and Mack and appellant began yelling at each other. Appellant went back into the house and told Mack that if he got out of the truck, a "banshee" would attack him. Appellant "let two or three rounds off in the air and disappeared into the house." Eventually, Mack went back into the house, and he and Brandy stayed in a locked bedroom the rest of the night. Mack later told Deputy Pruitt what had happened.

Whitney eventually left appellant and Rebekah's home, and she began living with Donna Dragoo, a foster parent, in April 2010. While living in Dragoo's home, Whitney told Dragoo that appellant had sexually abused her.

Grand juries indicted appellant for three counts of indecency with a child by contact (for touching Whitney's genitals, Mack's genitals, and Brandy's genitals while intending to arouse or gratify a person's sexual desire), two counts of sexual assault (for penetrating Courtney's anus by his sexual organ without her consent when she was an adult and for penetrating Brandy's mouth with his sexual organ when she was under seventeen years old), one count of

7

aggravated assault with a deadly weapon (for intentionally or knowingly threatening Mack with imminent bodily injury while using a gun), and one count of aggravated sexual assault of a child (for penetrating Brandy's sexual organ with his own sexual organ when she was younger than fourteen years old). Before appellant's trial began, he agreed to allow the cases arising from his acts in Stephens County to be tried in Young County together with the cases that arose there.

Appellant pled not guilty to each charge. At his trial, after the jury heard evidence and arguments from the parties, it deliberated for less than an hour before convicting him of each offense. In the punishment phase of the trial, appellant pled true to a repeat offender paragraph that six of his indictments contained; he therefore admitted that he had been previously convicted of indecency with a child. The jury assessed twenty years' confinement for appellant's sexual assault of Courtney and confinement for life for each of the six other offenses. The trial court sentenced appellant in accordance with the jury's verdicts, and it ordered all of the sentences, except for the sentence for aggravated assault with a deadly weapon, to run consecutively. Appellant brought these appeals.

**Evidentiary Sufficiency**

In his second and fourth issues, appellant argues that the evidence is insufficient to sustain two of his seven convictions. Specifically, he contends that the evidence is insufficient to support his conviction for indecency with a child

8

regarding sexual contact with Whitney and to support his conviction for aggravated assault with a deadly weapon.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that

resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

**Indecency with a child**

To obtain appellant's conviction for indecency with a child concerning his sexual contact with Whitney, the State had to prove that Whitney was younger than seventeen years old when appellant, with the intent to arouse or gratify the sexual desire of any person, touched any part of her genitals. *See* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1). Appellant contends that neither Whitney's outcry statements nor her testimony at trial establish that he touched her genitals.

The evidence showed that in April 2010, Whitney talked to another child in Dragoo's foster home about the "love game," which Whitney, who was five years old at the time, later nervously described to Dragoo as pretending to be naked in bed while kissing and touching private parts. Dragoo asked Whitney where she had learned of the love game, and Whitney said, "I see it in movies my daddy tells me to watch with him."

A couple of weeks later, Whitney and Dragoo were playing outside when a neighbor came outside without a shirt on. Whitney said that she wished that the man "was naked and had no underwear on and his wife had no bra on and they were kissing and touching people." Whitney also told Dragoo that appellant had told her that love meant being "naked in bed and kissing and touching each other."

Later in 2010, Whitney talked in Dragoo's home about her "tickle spot," which Whitney said was her "private spot." Whitney said that she learned about the "tickle spot" from appellant. Whitney told Dragoo that appellant "would pull [Whitney's] pants down and touch [her] there," that this usually happened when Whitney kissed appellant goodnight, and that Rebekah would see appellant touching Whitney and say, "Honey[,] please stop doing that to her. Don't touch her there." Whitney testified at trial that appellant had touched her on the "[f]ront" of her "private part."

Viewing this evidence in the light most favorable to the jury's verdict of conviction, and allowing for the fact that the jury could have drawn reasonable inferences from the evidence, we conclude that the evidence is sufficient to establish that appellant touched Whitney's genitals. Although Whitney spoke in imprecise terms in her outcries and in her testimony, she was only five and six years old, respectively, at the time of her April and September 2010 outcries, and she was only seven years old at the time of the trial. Thus, she could not have been expected to use exacting anatomic detail. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (stating that children are not expected to testify with the "same clarity and ability as is expected of mature and capable adults"); *Wallace v. State*, 52 S.W.3d 231, 235 (Tex. App.—El Paso 2001, no pet.) ("As a matter of public policy, the appellate courts of this state do not expect child victims of crime to testify with the same clarity and ability as is expected of mature and capable adults.").

11

Despite the imprecision in Whitney's language, a rational jury could have determined beyond a reasonable doubt that appellant touched her genitals because there was direct evidence that he touched the front of her "private part" after pulling her pants down. *See Mounce v. State*, 432 S.W.2d 104, 107 (Tex. Crim. App. 1968) (holding that the "testimony that the [defendant] placed his hands on the sexual private parts" of the victim was sufficient to prove that he touched her vulva); *Thomas v. State*, 399 S.W.2d 555, 556 (Tex. Crim. App. 1966) (holding that a seven-year-old girl's testimony that the defendant touched her "privates" after taking her panties off was sufficient to establish that the defendant touched the girl's vulva); *Mallet v. State*, 9 S.W.3d 856, 863–64 (Tex. App.—Fort Worth 2000, no pet.) (concluding that the victim's testimony that the defendant's penis went inside her "butt" or "backside" was sufficient to prove that it penetrated her anus); *Bryant v. State*, 685 S.W.2d 472, 474–75 (Tex. App.—Fort Worth 1985, pet. ref'd) (holding that the evidence was sufficient to establish that the defendant touched the victim's vagina when the victim testified that the defendant had put his hands underneath her underpants and had touched her between her legs).

Also, the jury heard other evidence, including facts from Whitney's outcries, that substantiated appellant's sexual interest in children. The jury could have considered this evidence when determining what Whitney meant when she testified that appellant had touched the front of her "private part." *See Wise v. State*, 364 S.W.3d 900, 907 (Tex. Crim. App. 2012) (holding that a jury could

12

consider the defendant's history of sexually assaulting children when deciding whether he knowingly possessed child pornography on his computer).

For these reasons, we hold that the evidence is sufficient to sustain appellant's conviction for indecency with a child by sexual contact of Whitney's genitals, and we overrule his second issue. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

**Aggravated assault with a deadly weapon**

To obtain appellant's conviction for aggravated assault with a deadly weapon against Mack, the State had to prove that appellant intentionally or knowingly threatened Mack with imminent bodily injury and used or exhibited a deadly weapon. *See* Tex. Penal Code Ann. §§ 22.01(a)(2), .02(a)(2) (West 2011). Appellant argues that there is "no evidence that [he] threatened [Mack] with imminent bodily injury and that a gun was exhibited as part of that threat." We disagree.

As summarized above, Mack testified that at Brandy's stepgrandmother's home, in an apparent effort to alleviate Mack's chest pains, appellant had Mack lie on a bed with his shirt off, and appellant then put a pistol on Mack's shoulder, head, and face. Appellant asked Mack, "Are you scared," and when Mack said that he was not scared, appellant "got angry." Appellant then repeated his question, and when Mack said again that he was not scared, appellant left the

13

room.[9]  Later, outside in a pickup truck, appellant again pointed the pistol at Mack.  After appellant touched Mack's genitals and appellant and Mack both became angry, appellant "let two or three rounds off in the air."  Toward the end of Mack's testimony on direct examination by the State, the following exchange occurred:

> Q. And your testimony was that he used that gun and he threatened you?
>
> A. Yes, ma'am.
>
> Q. Do you believe that gun was a deadly weapon?
>
> A. Yes, ma'am.
>
> Q. Were you -- the threat, were you in fear of imminent bodily injury?
>
> A. Yes, ma'am, I was.

The implication from appellant's argument is that he intended to do something other than threaten Mack with imminent bodily injury when he pointed the pistol at Mack on more than one occasion.  But even if the record raised that conflicting inference, in determining the sufficiency of the evidence to show a defendant's intent, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and [we] must defer to that resolution."  *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

---

[9]Mack confirmed at trial that he was scared when he was "looking down the barrel of [the] gun."

14

Viewing the evidence in the light most favorable to the jury's guilty verdict, we conclude that a rational jury could have discerned from Mack's testimony, beyond a reasonable doubt, that appellant intended to threaten Mack with imminent bodily injury by pointing the gun at him. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. Specifically, along with other evidence, the jury could have inferred this intent from the fact that appellant became angry when Mack said that he was not scared. The jury could have also inferred appellant's intent from his acts with the pistol. *See Ward v. State*, 113 S.W.3d 518, 521 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("Aiming a deadly weapon at a supposed victim is sufficient evidence of a threat to sustain an aggravated assault conviction."); *De Leon v. State*, 865 S.W.2d 139, 142 (Tex. App.—Corpus Christi 1993, no pet.) ("The mere presence of a deadly weapon, under proper circumstances, can be enough to instill fear and threaten a person with bodily injury."); *Gaston v. State*, 672 S.W.2d 819, 821 (Tex. App.—Dallas 1983, no pet.) (op. on reh'g) ("It was the presence of the gun in appellant's hand that instilled fear in complainant and made her feel threatened with bodily injury."); *see also Danko v. State*, No. 02-09-00386-CR, 2011 WL 167071, at *3 (Tex. App.—Fort Worth Jan. 20, 2011, pet. ref'd) (mem. op., not designated for publication) ("Danko's display of a gun was sufficient to establish the required threat of imminent bodily harm."). We overrule appellant's fourth issue.

## Admission of Evidence

In his first issue, appellant asserts that the trial court erred by admitting evidence about "extraneous offenses" that he committed when he sexually abused Courtney.[10]  He asserts that this alleged error requires reversal of all of his convictions.  He admits, however, that he did not object to the admission of such alleged extraneous evidence.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.  Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).  A reviewing court should not address the merits of an issue that has not been preserved for appeal.  *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010) (op. on reh'g).  Preservation of error is a systemic requirement.  *Id.* at 473–74; *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009).

---

[10]Appellant asserts that the trial court allowed extraneous evidence because although the State charged appellant only with penetrating Courtney's anus with his sexual organ, the jury also heard evidence that he touched her breasts and vagina with his penis.

16

Appellant recognizes these principles of error preservation and acknowledges that normally, a party forfeits error in the admission of evidence by failing to object at the time the evidence is offered. *See Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.") (footnote omitted); *Reyes v. State*, 361 S.W.3d 222, 229 (Tex. App.—Fort Worth 2012, pet. ref'd). Nonetheless, citing *Almanza v. State*, a case concerning error in a jury charge, appellant contends that despite his lack of an objection, we should review whether egregious error has occurred. *See* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

Appellant has not directed us to any decision adopting the *Almanza* jury-charge standard to a complaint about the admission of evidence. To the contrary, we have located decisions that refused to apply *Almanza* to unpreserved evidentiary complaints. *See Tapps v. State*, 257 S.W.3d 438, 448 (Tex. App.—Austin 2008) (op. on reh'g) ("We see no legal basis for extending the egregious error theory relating to unobjected-to jury charge error to the admission of unobjected-to evidence."), *aff'd*, 294 S.W.3d 175 (Tex. Crim. App. 2009); *Love v. State*, No. 13-01-00342-CR, 2002 WL 34230836, at *1 (Tex. App.—Corpus Christi July 3, 2002, pet. ref'd) (mem. op., not designated for

17

publication) (explaining that "*Almanza . . .* dealt with jury charge error, not error in the admission of evidence, and [is] inapplicable to" evidentiary complaints).

We hold that appellant forfeited his complaint about the admission of allegedly extraneous evidence by failing to object at trial. *See Devoe v. State*, 354 S.W.3d 457, 475 (Tex. Crim. App. 2011) ("Appellant did not object at trial to the admission of the complained-of evidence on constitutional or other grounds. Therefore, he presents nothing for our review."). We overrule appellant's first issue.

In his third issue, appellant argues that his conviction for indecency with a child regarding sexual contact with Whitney should be reversed because the trial court erred by failing to "suppress the hearsay [outcry] statement" that Whitney made to Dragoo. In a hearing outside of the presence of the jury, Dragoo testified that soon after Whitney came to live in Dragoo's foster home, Whitney played games that indicated to Dragoo that Whitney "knew too much about sex for her age." Specifically, Whitney played the love game, which Whitney described as pretending to be naked in bed while kissing and touching "private parts and stuff." Almost two weeks after that, Dragoo was outside playing with Whitney when a male neighbor came outside without a shirt on. Whitney said that she wished the man was "naked and had no underwear on and his wife had no bra on and they were kissing and touching people." Dragoo asked Whitney how she had learned about such behavior, and Whitney said that she had learned it from watching movies with appellant.

A few months later, one of the children in Dragoo's home told Dragoo's sister, "I can show you where your tickle spot is." The child described the "tickle spot" as the "private spot." The child said that Whitney had told her about the tickle spot. When Dragoo asked Whitney about what she had told the other child, Whitney said that appellant had shown her the tickle spot because he would pull her pants down and "touch [her] there."

At the end of Dragoo's testimony outside of the jury's presence, the State urged the trial court to find Whitney's outcries to Dragoo to be reliable and admissible under article 38.072 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2011). The trial court found that the outcries were reliable.

During the hearing outside of the jury's presence, appellant did not explicitly object to Dragoo's testimony or contest the State's request for the trial court to allow it. When Dragoo testified in front of the jury, appellant objected that the testimony about Whitney's outcries was hearsay, and the trial court overruled the objection.

Hearsay is generally inadmissible. *See* Tex. R. Evid. 802. But article 38.072 provides that a statement is not inadmissible on the basis that it is hearsay if, in relevant part, (1) the statement describes an offense under chapter twenty-one of the penal code that a defendant committed against a child younger than fourteen years of age; (2) the statement was made by the child to the first person who was eighteen years old or older, other than the defendant, that the

19

child spoke to about the offense; and (3) the "trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement." Tex. Code Crim. Proc. Ann. art. 38.072, §§ 1(1), 2; *see West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd). Outcry testimony admitted in compliance with article 38.072 is considered substantive evidence, admissible for the truth of the matter asserted in the testimony. *Duran v. State*, 163 S.W.3d 253, 257 (Tex. App.—Fort Worth 2005, no pet.)

"A court's decision that the outcry statement is reliable and admissible under article 38.072 will not be disturbed absent a clear abuse of discretion." *Id.*; *see Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990). A trial court abuses its discretion by admitting a statement under article 38.072 only when the court's decision falls outside of the zone of reasonable disagreement. *Bautista v. State*, 189 S.W.3d 365, 367 (Tex. App.—Fort Worth 2006, pet. ref'd).

Appellant contends that it is "clear that there were insufficient indices of reliability . . . of the child's statements to be admissible through Dragoo."[11] When reviewing the trial court's determination that an outcry statement was reliable, we consider "the time the child's statement was made to the outcry witness, the content of the child's statement, and the circumstances surrounding the making of that statement." *Broderick v. State*, 89 S.W.3d 696, 699 (Tex. App.—Houston

---

[11]Appellant does not contend that Whitney's statements to Dragoo were inadmissible under any requirement of article 38.072 other than reliability.

20

[1st Dist.] 2002, pet. ref'd).  Indicia of reliability that a trial court may consider include

> (1) whether the child victim testifies at trial and admits making the out-of-court statement, (2) whether the child understands the need to tell the truth and has the ability to observe, recollect, and narrate, (3) whether other evidence corroborates the statement, (4) whether the child made the statement spontaneously in his own terminology or whether evidence exists of prior prompting or manipulation by adults, (5) whether the child's statement is clear and unambiguous and rises to the needed level of certainty, (6) whether the statement is consistent with other evidence, (7) whether the statement describes an event that a child of the victim's age could not be expected to fabricate, (8) whether the child behaves abnormally after the contact, (9) whether the child has a motive to fabricate the statement, (10) whether the child expects punishment because of reporting the conduct, and (11) whether the accused had the opportunity to commit the offense.

*Norris v. State*, 788 S.W.2d 65, 71 (Tex. App.—Dallas 1990, pet. ref'd) (citing *Buckley v. State*, 758 S.W.2d 339, 343–44 (Tex. App.—Texarkana 1988), *aff'd*, 786 S.W.2d 357 (Tex. Crim. App. 1990)); *see In re M.R.*, 243 S.W.3d 807, 813 (Tex. App.—Fort Worth 2007, no pet.).

Whitney testified at trial (albeit after the trial court had admitted the outcries), and Whitney's testimony demonstrates that she had been told to tell the truth and that she had the ability to recollect facts that had occurred in the past.  Although Whitney did not testify about the outcries, she did testify that appellant had touched her on her private part, and she therefore confirmed, in part, her statements in the outcries.

Dragoo's testimony and her written reports indicated that Whitney had made the outcries spontaneously and in her own terminology; Whitney had

21

initially made statements to other children in Dragoo's home while using child-like terms such as Whitney's description of the "love game." Dragoo testified in the hearing outside of the jury's presence that as a foster parent, she had been trained in how to communicate with children regarding outcry statements.

Whitney's outcry about appellant's pulling her pants down and touching her private part was unambiguous, and we have not located evidence that is inconsistent with this outcry. The trial court could have reasonably determined that a child of Whitney's age would not have normally imagined things such as a parent's touching her private area or naked people kissing and touching each other.

The record does not disclose a motive that Whitney would have had to fabricate the outcries. Appellant had the opportunity to sexually abuse Whitney because he lived with her. Finally, the evidence establishes that Whitney was nervous when making the outcries, that she asked Dragoo whether Dragoo was going to tell appellant and Rebekah about one of the outcries, and that she did not want to testify at the trial.

Appellant notes, among other facts, that during Whitney's testimony, neither side particularly asked her about the statements that she had made to Dragoo. Appellant also contends that Whitney's outcries were not reliable because the State did not present medical evidence to corroborate them.[12] But

_____

[12]There was plentiful evidence, however, corroborating appellant's sexual interest in children.

22

considering the evidence under all of the factors listed above, we conclude that the trial court did not depart from the zone of reasonable disagreement by determining that the outcries were reliable, and we therefore hold that the court did not abuse its discretion by admitting the outcries. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(b)(2). We overrule appellant's third issue.

## Venue

In his fifth issue, appellant contends that his convictions in which Mack was the victim (aggravated assault with a deadly weapon and one of the indecency with a child by contact counts) should be reversed because the State failed to present sufficient evidence to support venue in Stephens County. Appellant's argument focuses on testimony by Tim Bay, a captain with the Young County Sheriff's Office. Captain Bay testified that he was "pretty sure" that appellant's crimes toward Mack occurred in Stephens County, although the county line "jog[s] back and forth." Appellant did not cross-examine Captain Bay on this testimony.

"To sustain the allegation of venue, it shall only be necessary to prove by the preponderance of the evidence that by reason of the facts in the case, the county where such prosecution is carried on has venue." Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005); *Rippee v. State*, 384 S.W.2d 717, 718 (Tex. Crim. App. 1964) (explaining that a venue determination will be upheld "if from the evidence the jury may reasonably conclude that the offense was committed in the county alleged"). When venue was not disputed in the trial court, as it was

23

not disputed here, we must presume, unless the record shows to the contrary, that venue was proved. *See* Tex. R. App. P. 44.2(c)(1); *Couchman v. State*, 3 S.W.3d 155, 161 (Tex. App.—Fort Worth 1999, pet. ref'd).

Even if the combination of the presumption under rule 44.2(c)(1) and Captain Bay's testimony was not sufficient to establish venue, Mack testified on more than one occasion, without equivocation, that the crimes against him occurred in Stephens County. Brandy also testified that her stepgrandmother's house, where appellant committed the crimes against Mack, was in Stephens County. Thus, we hold that the State sufficiently proved venue, and we overrule appellant's fifth issue.

## Conclusion

Having overruled each of appellant's issues, we affirm all of the trial court's judgments.

TERRIE LIVINGSTON<br>
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 26, 2012

24